KATHLEEN ANN KEOUGH, J.:
{¶ 1} Plaintiff-appellant, Ohio Quay 55 L.L.C. ("Quay 55"), appeals from the trial court's judgment granting summary judgment *196 in favor of defendant-appellee, the city of Cleveland (the "city"). We affirm.
I. Procedural Background
{¶ 2} On the night of January 17, 2014, a city water main ruptured near an apartment building owned by Quay 55. A portion of the building flooded and sustained damage as a result of the rupture. Quay 55 subsequently filed this action against the city alleging claims of negligence, trespass, and nuisance. The negligence claim made no allegation that the city acted with malicious purpose, in bad faith, or in a wanton or reckless manner. The city answered the complaint and asserted various defenses, among them that it was statutorily immune from liability under Ohio's Political Subdivision Tort Liability Act (the "Act"), R.C. 2744.01, et seq.
{¶ 3} After discovery was completed, the city filed a motion for summary judgment. The city argued that the trespass and nuisance claims were not actionable because the exceptions to sovereign immunity set forth in the Act are limited to negligent conduct, and do not include intentional torts such as trespass or nuisance. With respect to the negligence claim, the city argued that it was immune from liability under R.C. 2744.03(A)(5) because its employees exercised judgment and discretion in determining how to respond to the water main break.
{¶ 4} Quay 55 opposed the city's motion. It made no argument regarding its trespass and nuisance claims. With respect to its negligence claim, Quay 55 argued that the city's actions in responding to the water main break were negligent, and the negligence did not arise from a positive exercise of judgment or discretion. The trial court granted the city's motion, ruling that the city was immune from liability regarding Quay 55's claims. This appeal followed.
II. Law and Analysis
{¶ 5} In its single assignment of error, Quay 55 contends that the trial court improperly granted summary judgment to the city.
{¶ 6} Civ.R. 56(C) provides that summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) after construing the evidence most favorably for the party against whom the motion is made, reasonable minds can reach only a conclusion that is adverse to the nonmoving party. Zivich v. Mentor Soccer Club, Inc. , 82 Ohio St.3d 367, 369-370, 696 N.E.2d 201 (1998) ; Temple v. Wean United, Inc. , 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977). We review the trial court's judgment de novo, using the same standard that the trial court applies under Civ.R. 56(C). Grafton v. Ohio Edison Co. , 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996).
{¶ 7} Questions of immunity are matters of law, so they are particularly apt for resolution by way of summary judgment. FirstEnergy Corp. v. Cleveland , 179 Ohio App.3d 280, 2008-Ohio-5468, 901 N.E.2d 822, ¶ 7 (8th Dist.). We employ a three-tier analysis under the Act to determine whether a political subdivision enjoys immunity. Cramer v. Auglaize Acres , 113 Ohio St.3d 266, 2007-Ohio-1946, 865 N.E.2d 9. The first tier is the general rule that a political subdivision is immune from liability incurred in performing either a governmental or proprietary function. R.C. 2744.02(A)(1). The second tier of the analysis requires a court to determine whether any of the five exceptions to immunity listed in R.C. 2744.02(B) apply to expose the political subdivision to liability. If any of the exceptions to immunity apply, then the third tier of the analysis requires a court to determine whether any of the *197 defenses in R.C. 2744.03 apply, thereby providing the political subdivision a defense against liability. Id. at ¶ 14 -16, citing Colbert v. Cleveland , 99 Ohio St.3d 215, 2003-Ohio-3319, 790 N.E.2d 781, ¶ 7-9.
{¶ 8} Initially, we note that Quay 55 has not challenged the dismissal of its trespass and nuisance claims, presumably recognizing that the exceptions to sovereign immunity set forth in the Act are limited to negligent conduct, and do not include intentional torts such as trespass or nuisance. See, e.g., Fink v. Twentieth Century Homes, Inc. , 8th Dist. Cuyahoga No. 99550, 2013-Ohio-4916, 2013 WL 5970345, ¶ 21. Accordingly, we address whether the trial court properly granted summary judgment to the city on Quay 55's negligence claim.
{¶ 9} The parties agree that under the first and second tiers of the three-tier analysis, the city's operation of a municipal water supply system is a proprietary function, R.C. 2744.01(G)(2)(c), and that the city is "liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions." R.C. 2744.02(B)(2).
{¶ 10} The parties dispute the third tier of the analysis: whether any of the defenses in R.C. 2744.03 apply to provide the city with a defense against liability. The city argued, and the court found, that the city had a defense against liability under R.C. 2744.03(A)(5), which states:
The political subdivision is immune from liability if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner.
{¶ 11} Because Quay 55 made no allegation in its complaint that the city's employees acted with malicious purpose, in bad faith, or in a wanton or reckless manner, the determinative issue is whether the city's actions in responding to the water main break resulted from the exercise of judgment or discretion in determining how to use equipment, supplies, material, personnel, facilities or other resources. If they did, the trial court properly granted summary judgment to the city.
{¶ 12} The evidence produced by the city to support its motion demonstrated the following. On July 17, 2014, shortly after arriving at work to begin his shift as midnight supervisor for the city's water repair operations, Reinaldo Cotton received a telephone call from John Harciaga, a water pipe repairman. Harciaga, who was investigating a report of a water main leak on a 12-inch main on North Marginal Road near the Quay 55 building, told Cotton there was a "bad" leak at that location.
{¶ 13} At about the same time, Kim Thompson, chief of distribution for the city's division of water, received a telephone call from the division's dispatcher, who told him there was a "bad" water main break on North Marginal Road near the Quay 55 building. Thompson drove to the site of the water main break. When he arrived at approximately 11:15 p.m., he saw that Cotton was already there, working on locating a shut-off valve. Cotton was assisted by Harciaga and Winston Gragg, another water pipe repairman, who had been trying to locate shut-off valves when Cotton arrived at the site.
{¶ 14} Around midnight, Cotton dispatched a water main repair crew to the site; the crew arrived at about 12:45 a.m. on July 18, 2014. In the meantime, using the city's geographic information system *198 ("GIS") on his laptop computer, Cotton determined the locations of water main valves to close in order to isolate the leak. He located the first valve on South Marginal Road almost directly across the street from the Quay 55 building. The valve was covered by eight inches of dirt but, assisted by Thompson, Cotton dug it out and closed the valve at approximately 12:30 a.m. Upon closing this valve, the majority of the water flow into the parking lot of the Quay 55 building subsided.
{¶ 15} Cotton then spent about 20 minutes looking for a valve located in the Quay 55 building parking lot, as shown on the GIS report. He was unable to locate the valve because of false positive pulls with the metal wand he was using, and because cars were parked over it.
{¶ 16} He then began to search for the valve immediately to the west of the Quay 55 building along North Marginal Road. He was unable to locate both that valve and the next valve to the west because, as he later learned, a hydrant on the 12-inch main was missing. According to Jose Hernandez, manager of engineering for the city's water division, it is not unusual for a hydrant to be missing because the hydrants can be damaged during construction work or when hit by a vehicle and are designed to break off when hit.
{¶ 17} Cotton knew that nighttime safety was an issue for his crew because the valves on North Marginal Road are located on the highway berm. He also knew that the berm is covered in debris, including pieces of metal, which makes it difficult to locate the valves with a metal wand. In light of the safety issue, the difficulty in locating the valves, and because he had already spent 20 minutes looking for the valves in the highway berm, Cotton decided to look for the next valve. He located it on the Burke Lakefront Airport property, but determined that it would not be easy to access because it was under trees and brush inside the airport fence line. Cotton then remembered the location of the next valve to the west, also inside the secured fence perimeter of Burke Lakefront Airport. Because he was familiar with it, he decided to gain access to that valve instead.
{¶ 18} The airport was closed, so Cotton went to the security office for the airport and spoke with the guard. He and his crew then waited about 20 minutes for security clearance. When the guard escorted them to the valve, they shut down the valve and were escorted out. By this time, Harciaga had shut down a third valve at the intersection of East 49th Street and South Marginal Road to isolate the leak.
{¶ 19} While Cotton and his crew were locating and shutting down the valve to the west of the Quay 55 building, Thompson had continued to walk through the parking lot of the Quay 55 building to determine why the water in the lot was not draining away. When Cotton returned to the parking lot, he told Thompson that he was going to look for an outflow pipe, which he suspected might be blocked. Cotton located an outflow pipe near Lake Erie and determined it was obstructed with large slabs of concrete put there during the Quay 55 renovation. Cotton used a pry bar to move the concrete from the pipe and the water began to drain. After about twenty minutes, the parking lot was completely drained.
{¶ 20} City engineer Hernandez opined that the blocked outflow pipe was "alone" the factor that caused the overflow of water from the Quay 55 parking lot into the building. He concluded, in light of his experience, that there was no delay in closing the water main because it involved a complex nighttime water main shutdown that required locating and closing valves under difficult conditions. Hernandez opined that *199 this was not a routine shutdown because various factors-including a bad water main break at night along a highway, a concealed valve in the parking lot, a missing hydrant, and required security access to a valve-complicated the shutdown. According to Hernandez, city water crews responded to the site as soon as possible after dispatch, isolated the water main break, aided Quay 55 in addressing the parking lot drainage problem, fixed the problem by removing the storm drainage blockage, repaired the water main break, and restored service within a response time typical of this level of emergency.
{¶ 21} In light of this evidence, the city argued that it was entitled to immunity under R.C. 2744.03(A)(5) because its employees' determinations of how to respond to the water main break were not merely routine maintenance decisions that required little judgment, but were decisions involving the positive exercise of judgment and discretion.
{¶ 22} In its brief in response to the city's motion, Quay 55 argued that the city was negligent because it failed to respond promptly to the report of the water main break and failed to promptly shut off the first valve. It asserted that the report of the break was made at 9:34 p.m., but the first valve was not shut until nearly three hours later. It contended that "the only explanation" was that the city waited for Cotton to begin his shift before dispatching anyone capable of locating and shutting valves. It argued further that locating and shutting valves is a routine step in a political subdivision's response to a water main break, and the situation presented by the water main break on July 17, 2014 did not present any nonroutine circumstances, and thus the city's employees did not exercise any positive discretion or judgment in responding to the break. Accordingly, Quay 55 argued that the city was not entitled to immunity under R.C. 2744.03(A)(5).
{¶ 23} It also argued that the city was negligent for failing to maintain accurate strip maps of the water supply system reflecting locations of water mains and appurtenances such as valves, hydrants, and manholes. It argued that accurate maintenance of strip maps is part of the city's duty to maintain its water supply system and does not call for the exercise of judgment or discretion and, accordingly, the city was not entitled to immunity under R.C. 2744.03(A)(5).
{¶ 24} Finally, Quay 55 asserted that the city was negligent for failing to implement a maintenance management system with procedures for ensuring prompt responses to water main breaks and accurate maps of the system. Quay 55 argued that the responsibility to implement and maintain a maintenance management system is not discretionary, and thus the city was not entitled to immunity under R.C. 2744.03(A)(5).
{¶ 25} Quay 55 produced a report from its expert, Christopher Courtney, in which Mr. Courtney opined that in his experience as an engineer for multiple municipalities, a city's failure to maintain a written maintenance management system is inconsistent with the city's duty to maintain the city's water supply system. Mr. Courtney also stated that he conducted a site visit on September 8, 2016, to observe the water main break location utilizing the same strip map used by the city when it responded on July 17, 2014. Mr. Courtney noted that he and his crew were unable to locate any valves to the west of the Quay 55 building even though two valves are shown on the map, and that a number of hydrants shown on the map were not present in the field.
{¶ 26} The trial court found that in responding to the water main break, "not *200 surprisingly, the Cleveland water department encountered some difficulties in locating shutoff valves due to a number of adverse circumstances and the fact that it was evening." It ruled that the city was immune from liability under R.C. 2744.03(A)(5) because "it is clear that the actions taken that evening in attempting to solve the water leak as expeditiously as possible required both judgment and discretion on the part of water department employees." We agree with the trial court.
{¶ 27} This court has recognized that routine decisions requiring little judgment or discretion are not covered by R.C. 2744.03(A)(5). Ohio Bell Tel. Co. v. Cleveland , 8th Dist. Cuyahoga No. 98683, 2013-Ohio-270, 2013 WL 408940, ¶ 13. Likewise, R.C. 2744.03(A)(5) does not protect decisions that involve inadvertence, inattention, or unobservance. Id. Rather, "some positive exercise of judgment that portrays a considered adoption of a particular course of conduct in relation to an object to be achieved" is required to demonstrate an exercise of discretion for which R.C. 2744.03(A)(5) confers immunity. Id.
{¶ 28} It is apparent that the water main break that occurred on July 17, 2014, required more than a merely routine response, and that the city's employees exercised a large degree of discretion and judgment in responding to the situation. First responder Harciaga exercised judgment in assessing the severity of the leak, working to locate valves to close, and advising Cotton he should come to the scene. Cotton and Thompson, the supervisors, exercised judgment and discretion in responding immediately to the site and trying to locate valves for shutdown. Cotton exercised judgment and discretion in determining whether and how long to utilize the personnel and equipment of the water department in trying to locate the valves shown on the GIS map before deciding to move on to the next valve. Cotton weighed the safety of his crew, the difficulty of locating valves on the berm of North Marginal Road at nighttime, and the amount of time already spent in looking for valves there before deciding to look for the next valve. Cotton used his prior knowledge and experience in locating a second valve at the Burke Lakefront Airport upon determining that the first valve there would be too difficult to shut in a timely manner because it was covered by trees and inside the fence. This decision, among the many other decisions made that night about how to respond to the serious water main break, was a judgment call that required more than just a routine response; it involved the positive exercise of judgment and discretion.
{¶ 29} Quay 55 argues that the city's response to the water main break did not involve the positive exercise of judgment and discretion but, rather, that its damages resulted from the city's failure to make a positive exercise of judgment or discretion. Quay 55 argues that the city's failure to dispatch capable employees to deal with the rupture in a timely manner is one example of the city's inaction. It further contends that the city's failure to close the first shutoff valve for three hours after the leak was reported indicates there was no reasoned exercise of judgment or discretion in the city's response to the emergency. Quay 55 asserts that, contrary to the trial court's conclusion, the city did not attempt to solve the water leak as expeditiously as possible but rather failed to exercise its judgment to respond in a timely and effective manner. We are not persuaded.
{¶ 30} First, Quay 55's argument that the city failed to dispatch capable employees in a reasonable time is not supported by the facts. The evidence demonstrates that the water main leak was reported to *201 the city at 9:34 p.m. and repairmen arrived at the site at 10:15 p.m., within 45 minutes of the report.[1] Furthermore, the mere fact that these employees could not immediately find and close a shutoff valve does not mean, as Quay 55 asserts, that the city failed to dispatch qualified and capable employees. Quay 55 offers no evidence whatsoever to support this assertion.
{¶ 31} The undisputed evidence demonstrates that the city's employees did, in fact, affirmatively exercise their judgment and discretion to resolve as expeditiously as possible what the city itself classified as an "extreme emergency." The valve in the parking lot of the Quay 55 building was not accessible, and the valves on the berm of North Marginal Road were difficult and dangerous to access at nighttime. Weighing the benefits and risks, a decision was required as to whether and for how long to spend time and resources attempting to locate each valve before deciding to move on to the next valve. The decisions of the crew and supervisors required the positive exercise of judgment and discretion to protect the safety of the crew, limit further damage, and expeditiously restore and repair service.
{¶ 32} Quay 55 relies on Matter v. Athens , 2014-Ohio-4451, 21 N.E.3d 595, and Brown v. Akron , 9th Dist. Summit Nos. 15053 and 15066, 1992 WL 48505 (Mar. 11, 1992), as support for its argument that the "unexplained and unjustified delay" in shutting down the first valve demonstrates that the city did not exercise discretion and judgment in responding to the break. Quay 55's reliance on these cases is misplaced.
{¶ 33} In Matter, residential homeowners sued the city of Athens for damage to their residence incurred as a result of water line break in their yard. The appellate court reversed the trial court's grant of summary judgment to the city under R.C. 2744.03(A)(5). The appellate court found that the break was reported at 4 p.m. but not repaired until 9:30 p.m. The court also found that there was no evidence that the crew responding to the water line break "considered or weighed the different options available to them in trying to stop the flow of water from the break and then rejected them for whatever reasons." Id. at ¶ 47. The court further found that there was no evidence in the record demonstrating "that the crew engaged in any sort of decision-making process or weighing of alternatives with respect to their failure to avail themselves of the built-in manual overrides to the water supply system." Id. Therefore, the court held that there was no positive exercise of judgment by the crew and the trial court erred in granting summary judgment under R.C. 2744.03(A)(5). Id. at ¶ 48.
{¶ 34} That was not the situation here. Although the first valve was not shut off until three hours after the break was reported, the evidence in the record clearly demonstrates that the supervisors and crew attempted in those three hours to locate, find, and shut off valves as expeditiously as possible to isolate the leak, and exercised discretion and judgment to consider alternatives when confronted with valves too difficult to access. The mere fact that the leak was not fixed as promptly as Quay 55 would have liked does not mean the city did not exercise positive discretion in attempting to fix the leak as expeditiously as possible.
{¶ 35} In Brown , the city of Akron was notified at 5:57 a.m. of a water main break.
*202 The city's water distribution superintendent arrived at work between 6:00 and 6:15 a.m. and decided that given the amount of time it would take to get an emergency crew in, he would wait until 7:30 a.m. to dispatch a shift employee. The city worker finally shut the valve at 8:15 a.m., two hours after the leak was reported and after several homeowners' basements had filled with water. The city argued that it was immune from any liability under R.C. 2744.03(A)(5) because the superintendent's decision regarding when to dispatch an employee was a discretionary decision. The appellate court held that the trial court erred in granting summary judgment to the city under R.C. 2744.03(A)(5) because the city's action in dispatching an employee within a reasonable time to close the valve was a nondiscretionary act not protected by immunity.
{¶ 36} Brown is not analogous to this case. The evidence in this case demonstrates that the city dispatched its employees immediately upon learning of the break. That it took several hours after notification of the leak to shut down the first valve does not demonstrate that the city did not positively exercise discretion and judgment in trying to stop the leak as expeditiously as possible. Despite Quay 55's argument otherwise, the city did not fail to act, and there was no "unexplained and unjustified delay" in responding to the water main break or, in light of the difficulty of the operation, in shutting down the valves to isolate the leak.
{¶ 37} Quay 55 next argues that the city was not entitled to immunity under R.C. 2744.03(A)(5) because the city negligently failed to maintain accurate strip maps and implement a maintenance management system. These arguments are without merit.
{¶ 38} Quay 55 cites to Mr. Courtney's report about his crew's inability to locate valves and hydrants shown on the strip map to support its allegations. But the failure of Mr. Courtney's crew to locate the valves and hydrants shown on the map does not demonstrate the maps were inaccurate; it demonstrates only that the crew was unable to locate them. In a field investigation conducted on October 11, 2016, the city's water crews, using the same map, located all five valves west of the Quay 55 building and all hydrants shown on the map except for one.
{¶ 39} Moreover, the evidence demonstrates that there is no requirement for a water utility in the state of Ohio to implement a maintenance management system. And in any event, whether to implement such a system would be a discretionary policy decision subject to immunity under R.C. 2744.03(A)(3), which provides immunity where an employee's actions or failure to act were within the policy-making, planning, or enforcement powers of the duties and responsibilities of the employee's office or position.
{¶ 40} The city's response to the water main break that occurred on January 17, 2014, was not merely routine; it required the exercise of discretion and judgment. Accordingly, the city is immune from liability under R.C. 2744.03(A)(5), and the trial court properly granted the city's motion for summary judgment.
{¶ 41} Judgment affirmed.
TIM McCORMACK, P.J., and LARRY A. JONES, SR., J., CONCUR

Quay 55's assertion that a repairman was not "dispatched" until 10:15 p.m. is incorrect; repairmen were dispatched when the city received the report and arrived on site at 10:15 p.m.