[Cite as *Wood v. Crestwood Assoc., L.L.C.*, 2010-Ohio-1253.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STEVEN WOOD, ET AL.,

    PLAINTIFFS-APPELLANTS,        CASE NO. 1-09-37

    v.

CRESTWOOD ASSOCIATES, LLC, ET AL.,      O P I N I O N

    DEFENDANTS-APPELLEES.

**Appeal from Allen County Common Pleas Court**
**Trial Court No. CV-2008-0992**

**Judgment Reversed and Cause Remanded**

**Date of Decision: March 29, 2010**

APPEARANCES:

    *Richard E. Siferd* **for Appellants**

    *Courtney J. Trimacco* **for Appellees**

**PRESTON, J.**

{¶1} Plaintiffs-appellants, Steven and Laura Wood (hereinafter "Steven" and "Laura"; collectively "the Woods"), appeal the Allen County Court of Common Pleas' grant of summary judgment in favor of defendants-appellees, Crestwood Associates, L.L.C., Newbury Management Co., and Crestwood Mobile Home Park (hereinafter collectively "Crestwood"). For the reasons that follow, we reverse.

{¶2} The Woods own a mobile home in Crestwood Mobile Home Park. (Steven Wood Depo. at 8). Sometime between 5:15 a.m. to 5:20 a.m. on July 24, 2006, Steven left his mobile home riding his Trek hybrid bicycle to work. (Steven Wood Depo. at 29, 35); (Laura Wood Depo. at 19). As Steven reached the bottom of a grade on Crestwood Drive, he lost control of his bicycle, fell off his bicycle, and shattered part of his leg. (Steven Wood Depo. at 34-35, 47).

{¶3} On June 24, 2008, the Woods filed a complaint in the Allen County Court of Common Pleas alleging, in count one, that Crestwood had negligently permitted an "irregular shaped hole" to exist in its privately owned street, "which caused [Steven's] bike to abruptly stop and throw plaintiff to the ground thereby fracturing his leg." (Doc. No. 1, at ¶¶1, 3, 7). In count two, Laura alleged a loss of society, companionship, and services of her husband Steven. (Id. at ¶10).

{¶4} On May 1, 2009, Crestwood filed a motion for summary judgment alleging that Steven could not establish what caused his bicycle accident, and that Laura's claim, as a derivative action, must also fail. (Doc. Nos. 28-29).

{¶5} On June 5, 2009, the Woods filed a response to Crestwood's motion arguing that his accident was caused by a groove, or "90-degree arc," in the roadway. (Doc. No. 33). Attached to the Woods' response was a picture of the patched groove, or "90-degree arc," which Steven averred was not repaired at the time of his accident. (Id., Exs. A, 1). Steven averred in his affidavit that the photograph was an accurate picture of the "circular gouge in the roadway of the trailer park where [his] bike jerked from under [him]." (Id., Ex. A). Steven further averred that, "[t]he gouge was 2 to 3 inches deep and was such that a bicycle tire would just fit and be grabbed by the gouge, forcing the wheel to the right. This is what happened to me as the bike jerked from under me." (Id.).

{¶6} On June 22, 2009, Crestwood filed a reply brief in support of their motion for summary judgment, arguing that Steven's affidavit contradicted his deposition testimony. (Doc. No. 36). Specifically, Crestwood alleged that, at his deposition, Steven indicated that he did not know what caused the accident, but that, after he examined the scene some 10 days after the accident, he thought it was a groove in the roadway. (Id.). Crestwood also argued that the trial court

should not consider the photograph attached to the Woods' response since it was not properly authenticated in Steven's affidavit. (Id.).

{¶7} On July 1, 2009, the trial court granted Crestwood's motion for summary judgment. (July 1, 2009 JE, Doc. No. 42). The trial court found that Steven's deposition testimony indicated that he was unaware of the cause of his accident; and therefore, this Court's decision in *Weaver v. Steak n' Shake Operations* was controlling. (Id., citing 3d Dist. No. 1-05-91, 2006-Ohio-2505). With regard to Steven's affidavit, the trial court found that "a contradiction between [Steven's] deposition testimony and [his] affidavit [exists] because, at first, plaintiff said he did not know how the crash occurred and then, in the affidavit, he said exactly what happened." (Id.). Since Steven failed to provide a reason for this apparent contradiction, the trial court found that his affidavit could not create a material issue of fact to preclude summary judgment. (Id., citing *Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, ¶¶28-29).

{¶8} On July 20, 2009, the Woods filed their notice of appeal. (Doc. No. 43). The Woods now appeal raising one assignment of error for our review.

{¶9} In their sole assignment of error, the Woods argue that Steven's testimony, when construed in a light most favorable to them as the non-moving parties, was not contradictory. The Woods argue that the testimony was essentially that Steven did not know what the cause of the accident was at the time

of the accident, but later figured out that the cause of the accident was the groove in the road, which was not patched at the time of the accident. The Woods also assert that the facts of this case are distinguishable from *Weaver v. Steak 'n Shake Operations*, upon which the trial court relied. Specifically, the Woods contend that people can fall for no reason other than a misstep, but a bicycle's handle bars are not jerked violently out of the operator's hands for no reason. They also contend that unlike the defect in *Weaver*, the defect here is fixed, and there is photographic evidence and a tacit admission by Crestwood that the defect was present in the street. Finally, the Woods point out that the manager of Crestwood admitted that a waterline had been repaired in the place where Steven was injured the previous winter, and that she had attempted a repair at that same place.

{¶10} Crestwood, on the other hand, argues that this Court's prior decision in *Weaver* is dispositive. Like the plaintiff in *Weaver*, Crestwood contends that Steven's guess, speculation, or wishful thinking does not create an inference of negligence. Specifically, Crestwood argues that during his deposition Steven testified several times that he did not know what caused the accident, but that some ten days later he determined that the groove in the road "had to" cause his accident since it "was the only explanation." Crestwood also contends that Steven's contradictory affidavit cannot create an issue of material fact.

{¶11} We review a decision to grant summary judgment de novo. *Doe v. Shaffer* (2000), 90 Ohio St.3d 388, 390, 738 N.E.2d 1243. Summary judgment is proper where there is no genuine issue of material fact, the moving party is entitled to judgment as a matter of law, and reasonable minds can reach but one conclusion when viewing the evidence in favor of the non-moving party, and the conclusion is adverse to the non-moving party. Civ.R. 56(C); *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.* (1994), 69 Ohio St.3d 217, 219, 631 N.E.2d 150.

{¶12} "A park operator who is a party to a rental agreement shall * * * [k]eep all common areas of the premises in a safe and sanitary condition[.]" R.C. 3733.10(A)(3). While acknowledging that claims against park operators are governed under R.C. Chapter 3733 and not R.C. Chapter 5321 (governing landlords), the Court of Appeals has, nonetheless, applied analogous landlord-tenant case law when analyzing claims of negligence arising under R.C. 3733.10(A). *Sterling v. Stevens*, 7th Dist. No. 02 JE 47, 2003-Ohio-5153, ¶¶6-7 (noting the lack of Ohio case law addressing a park operator's duty under R.C. 3733.10(A)), citing *Schwartz v. McAtee* (1986), 22 Ohio St.3d 14, 488 N.E.2d 479, paragraph one at the syllabus ("R.C. Chapter 5321 does not govern the relationship between manufactured home park operators and their tenants."). *Lewis v. Wall*, 11th Dist. No. 2007-A-0048, 2008-Ohio-3387, ¶¶16-18. See, also,

*Bundy v. Sky Meadows Trailer Park* (Oct. 23, 1989), 12th Dist. No. CA89-01-002, at *3 (R.C. 3733.10(A)(3) is taken from R.C. Chapter 5321). The Court of Appeals and the Ohio Supreme Court have analyzed tenants' slip and fall-type injuries that occurred in the common areas using premise liability rules. See, e.g., *Peterson v. Coffman & Bender* (Sept. 15, 2000), 11th Dist. No. 99-P-0059, citing *LaCourse v. Fleitz* (1986), 28 Ohio St.3d 209, 210-11, 503 N.E.2d 159. The Court of Appeals in *Lewis* has applied premise liability rules to a mobile home park resident's negligence claim filed against a mobile home park operator for injuries she sustained after she tripped and fell over a retaining wall located on her lot. 2007-Ohio-3387, at ¶¶3, 48-72 (concluding that the retaining wall was "open and obvious" so park operator was entitled to judgment as a matter of law). For these reasons, we turn to this Court's analogous premise liability cases for guidance.

{¶13} As with any negligence action, the plaintiff alleging negligence arising from a slip and fall-type injury "* * * must show the existence of a duty, a breach of that duty, and an injury resulting proximately therefrom" to avoid summary judgment. *Adkins v. Chief Supermarket*, 3d Dist. No. 11-06-07, 2007-Ohio-772, ¶10, quoting *Menifee v. Ohio Welding Products, Inc.* (1984), 15 Ohio St.3d 75, 77, 472 N.E.2d 707. However, "an inference of negligence does not arise from mere guess, speculation, or wishful thinking, but rather can arise only

upon proof of some fact from which such inference can reasonably be drawn." *Adkins*, 2007-Ohio-772, at ¶9, citing *Parras v. Standard Oil Co.* (1953), 160 Ohio St. 315, 116 N.E.2d 300, paragraph two of the syllabus; *Weaver v. Steak n' Shake Operations*, 3d Dist. No. 1-05-91, 2005-Ohio-2505, at *2, citing *Parras*, paragraph two of the syllabus. Accordingly, the plaintiff must "show how and why any injury occurred so as to develop facts from which it can be determined by a jury that the defendant failed to exercise due care and that such failure was a proximate cause of the injury." *Adkins*, 2007-Ohio-772, at ¶9, citing *Boles v. Montgomery Ward* (1950), 153 Ohio St. 381, 389, 92 N.E.2d 9; *Stamper v. Middletown Hosp. Assoc.* (1989), 65 Ohio App.3d 65, 67-68, 582 N.E.2d 1040; *Cleveland Athletic Assn. Co. v. Bending* (1934), 129 Ohio St. 152, 194 N.E. 6, paragraph two of the syllabus; *J.C. Penny Co. v. Robinson* (1934), 128 Ohio St. 626, 193 N.E. 401, paragraph four of the syllabus. "Where the plaintiff, either personally or by outside witnesses, cannot identify what caused the fall, a finding of negligence on the part of the defendant is precluded." *Stamper*, 65 Ohio App.3d at 68, citing *Bending*, 129 Ohio St. 152; *Mines v. Russo's Stop & Shop* (Feb. 23, 1989), 8th Dist. No. 55073; *Smith v. Reschs Bakery* (Dec. 10, 1987), 10th Dist. No. 87 AP-897.

**{¶14}** The issue sub judice is whether the Woods have established facts upon which a jury could find the proximate cause of Steven's bicycle accident. At his deposition, Steven testified, in pertinent part:

> **Q:** **Can you take me through your morning that day, July 24th, 2006, during when you left your house?**
> **A:** **When I left my house on my bike my wife and I were in the driveway together. She was taking our dog for a walk. She did most mornings, she jogs with our dog. I said good-bye and I left on my bike. She went the opposite direction.**
>
> **There's a slight valley in the road right there, so I would build up speed in the downhill part to get momentum to go up the other side, and I hit this --** *well, at the time I didn't know what it was, but it ended up later I saw there was a groove in the road.* **I was just peddling fast and hard and my bicycle just jerked right out from underneath me and I crashed in the road.**
> \* \* \*
> **Q:** **Can you explain to me how you fell, how the bike came away from you as well?**
> **A:** **I was riding and concentrating on the road ahead and it instantly jerked to the right and my momentum -- I just kept continuing forward. The only thing I can recall is thinking what happened, where did my bike go, because it felt like somebody reached out and jerked it from right underneath me.**
> \* \* \*
> **Q:** **Do you know what caused your bike to crash that day?**
> **A:** **I think I do. That morning I didn't know.**
> **Q:** **That morning you didn't know?**
> **A:** **No.**
> **Q:** **When did you know?**
> **A:** **When I came home from the hospital ten days later, my daughter was driving the car and I had her stop so that I could look at the road to see what had jerked the bike out from underneath me, because I could not figure out why it would have done that. There was a groove in the road. It was a little wider than my tire and several inches deep. It was a 90-degree arc right where my wheel hit and it had taken the bike right out from underneath me.**

**Q:** **But you didn't notice that groove the day of the incident?**
**A:** **No.**
**Q:** **You didn't see that groove the day of the incident?**
**A:** **No.**
* * *
**Q:** **How do you know that it was this groove in the road that you hit if you didn't notice it that day?**
**A:** **There had been repair done to – I'm assuming it was probably a water line underneath the road. They had that area excavated. There was an area approximately six foot square that they had cut the pavement out, dug up, worked on a pipe. I'm assuming it was a pipe because quite often there are city water line problems in the park. That repair had been -- they probably had it barricaded off previously. It had been repaired and repaved. There was new asphalt there. I knew I could assume that I could ride over that as the barricades were gone. The asphalt had been – the pavement had been redone so it was open.**

**As I rode over that area, my bike was just jerked right out from underneath me and then when I came back from the hospital, like I said, I had my daughter stop the car. I looked at it to see why that would have happened and in the daylight I could see this 90-degree arc.** *That was the only explanation.*
**Q:** **But you don't have any recollection that day of hitting the pothole?**
**A:** **It wasn't a pothole, it was a groove in the road.**
**Q:** **You don't have any recollection that day of hitting that groove?**
**A:** **I recollect my bike being jerked out from right underneath me as I rode over that freshly paved area.**
* * *
**Q:** **The day that you fell, what did you think caused the fall?**
**A:** **I didn't know because the road looked open. I knew there was this fresh asphalt. I had driven over it, but I couldn't see anything. It wasn't like there was something physically blocking the road. It was a shock actually, because I remember flying through the air thinking what the heck happened to my bike. It was like something physically jerked it right out from underneath me.**

> **Q: Then after you got out of the hospital you went back to the area where you fell?**
> **A: I knew exactly where it was. I remember seeing the area of fresh pavement. I had my daughter stop, then I looked at it and that groove was there. *It was obvious that was what had jerked my bike from underneath me.***
> **Q: Why was that obvious?**
> **A: Because of how -- as I was riding along my bike quickly just jerked to the right exactly the way that groove in the road -- I could remember my bike turning right with the -- * * * My bike had turned very suddenly to the right without -- some force had forced it out of the strength of my arms holding the handlebars, had pulled my front wheel to the right and I could not control it.**

(Steven Wood Depo. at 31, 34-35, 61, 63-64, 70-71) (emphasis added).

{¶15} At her deposition, Laura testified regarding what Steven and her thought caused the accident as well:

> **Q: Did your husband ever tell you how he thought he fell?**
> **A: I'll tell you, the strangest thing was he kept saying it's like my bike was jerked out from under me. He kept insisting that, and we kind of are comical with each other. I told him that probably the hobbits grabbed the front wheel and ripped the bike out from under him. I was being silly, but he insisted that it had just stopped immediately and I stopped. I said what is he talking about. How can that have happened. I stopped and I saw that spot in the road and I knew that had to have been it. It was just amazing when I saw that and that's when I knew it had to be it.**
> **Q: He didn't know at the time though, that --**
> **A: That that spot was there, I don't recall him knowing. I'm sure we've ridden our bikes or walked, but you see these things and you don't -- it wasn't like it was just some huge pothole that stuck out. His front tire had to fit perfect in there. It was weird, so strange.**
> **Q: When he first got to the hospital and you were discussing it with him, he didn't know actually what caused it?**

**A: No. He just kept telling me he felt like somebody just grabbed my front tire and jerked it and I just went flying because you wonder. You just keep wondering how can these things happen, but he insisted it and he just kept going back to that. I kept thinking about it, and when I stopped and looked at the road, oh, my gosh.**

**Q: When did you stop to look at the road?**

**A: I don't remember the exact time or day. So much was going on. * * * I just remember stopping and seeing it and there it was. I was just floored that there was that spot. I'm like oh, my gosh, you know what, that's it.**

**Q: But at the time of the accident he didn't know what the cause was?**

**A: No. I got down there after he fell and we didn't have any idea. I didn't have any idea at that time either. I don't believe he did. I can't imagine, but I don't know.**

**Q: Once you went back you saw that there was an arc in the road?**

**A: I saw that there was, definitely.**

**Q: Were there a lot of potholes in the road?**

**A: There's a lot of potholes and you definitely can avoid them on your bike or car when you come through there. * ** I was not aware of that spot like that until I stopped after his accident * * ***

(Laura Wood Depo. at 71-73).

{¶16} The Crestwood Mobile Home Park manager, Loretta Bellman, testified that maintenance and she were responsible for cold-patching potholes in the mobile home park. (Bellman Depo. at 5, 15). Bellman testified that the D-shaped area in the top photograph in plaintiff's exhibit one was a section of the road that was re-paved in the winter of 2005 after a frozen water line was repaired. (Id. at 28-31); (Plaintiff's Ex. 1). When asked about the small black area in the top photograph and the lower photograph of plaintiff's exhibit one, Bellman

testified, "[t]o say what exactly it was, it could have been a little lower than the pavement or it could have been a small pothole, you know, but I can't tell you that directly." (Bellman Depo. at 31); (Plaintiff's Ex. 1). With regard to when the smaller repair was done, Bellman testified that "[i]t could have been done any time from then until now," and Bellman was not certain whether the park fixed this section or the company that repaved the larger section of the road. (Bellman Depo. at 31, 33). Bellman further testified:

> **Q:** **And you don't know when it was fixed?**
> **A:** **Not just from a picture.**
> **Q:** **All right. What is the criteria for fixing a whole? How deep does it have to be?**
> **A:** **We try to fill them all, but they don't stay in always.**
> **Q:** **All right. Is there a lot of disrepair in the drive?**
> **A:** **A lot?**
> **Q:** **Yeah.**
> **A:** **After winter, you can have them scattered, uh-hum, yes.**
> **Q:** **Now, Steve didn't say where he fell or did he?**
> **A:** **He said in front of the office.**
> **Q:** **And did you go down and look then?**
> **A:** **Yes.**
> **Q:** **And what did you see down there?**
> **A:** **At that time, I saw nothing where he would have, a pothole in front of the office.**
> **Q:** **Did you see this black spot or this black area?**
> **A:** **No. I can't -- I shouldn't -- no, I don't remember that.**
> **Q:** **You don't remember.**
> **A:** **Yes.**

(Bellman Depo. at 31-32). Bellman did testify that the area photographed in plaintiff's exhibit one was across the street and in front of the park office. (Id. at 35-36).

{¶17} Although the facts of this case closely resemble those presented in *Weaver v. Steak n' Shake Operations*, the facts here are importantly different. 3d Dist. No. 1-05-91, 2005-Ohio-2505. In that case, this Court adopted the trial court's judgment entry and incorporated it by attaching it to our opinion as exhibit A. Id. at ¶2. The trial court summarized the pertinent facts in *Weaver* as follows:

> **Mrs. Weaver said that when she walked into the restaurant, she did not pay attention to notice any icy spot or the parking bump or block dislodged or anything out of the ordinary in the area where she fell. She said she "tripped on something," and "something made her fall." She stated, "if [the parking block] was sticking out," she wouldn't see it "because if it had snow there … you would never see that in a million years." It is uncontroverted that Mrs. Weaver never actually saw the parking bump dislodged the night she fell. Mr. Weaver stated he has no way of knowing whether the parking bump was dislodged when he [sic] wife fell. Photographs of the area taken a couple days after the fall show the parking block had been dislodged.**

*Weaver*, 2005-Ohio-2505, at *1. Mrs. Weaver, like the Woods herein, was appealing the trial court's grant of summary judgment. Id. at ¶2. After reviewing the facts and law in that case, the trial court, and ultimately this Court, concluded that:

> **\* \* \* guessing that the parking block was dislodged when Mrs. Weaver fell or estimating when the parking block or bump became dislodged solely based on when it might have snowed, when Marvin Gardens was there to shovel snow, or when pictures were taken after the fall would be tantamount to speculation and does not establish an issue of material fact. See *Deditch v. Silverman Bros., Inc.* (July 30, 1998), Cuyahoga App. No. 73215 ("[The plaintiff] attempted to guess that [the liquid**

> **detergent] had been on the floor for ten minutes based on the size of the spill, but that guess did not establish an issue of material fact.").**
>
> **To reach the conclusion that the defendants had negligently created the hazard of the dislodged parking bump or negligently failed to maintain safe premises, the Court would have to engage in the impermissible stacking of inference upon inference. In order for plaintiffs to avoid summary judgment, it must not only be inferred that the [sic] Mrs. Weaver tripped on a dislodged parking bump or block, but also inferred that the defendants negligently allowed the unsafe condition of the dislodged block to remain on it premises where Mrs. Weaver fell, and that the dislodged block or bump was the cause of her fall. Furthermore, plaintiffs themselves admitted that there was no way to say for sure that the block was dislodged when Mrs. Weaver fell or that a dislodged block caused the fall. Simply put, plaintiffs have failed to show proof of some fact from which such inferences can reasonably be drawn.**

*Weaver*, 2005-Ohio-2505. This Court ultimately concluded that summary judgment was appropriate because Mrs. Weaver could not identify or explain the cause of her fall. Id. at *3-4.

{¶18} The facts here resemble *Weaver* but are, nonetheless, significantly different. Although like Mrs. Weaver, Steven admitted that he did not see the groove or "90 degree arc" in the road on the day of the accident, Steven *did* subsequently identify the cause of his accident as being the "90-degree arc" or groove in the road. (Steven Wood Depo. at 31, 61, 64, 71); (See, also, Complaint, Doc. No. 1, at ¶¶1, 3, 7). Mrs. Weaver only indicated she "tripped on something," and that "something made her fall," or that, hypothetically, "if [the parking block]

- 15 -

was sticking out," she wouldn't see it "because if it had snow there … you would never see that in a million years." Id.  Mrs. Weaver, however, unlike Steven here, never directly identified the parking block as the cause of her injury at any time; she only suggested that it *could have been* the cause of her injury.

{¶19} We are also not persuaded by Crestwood's arguments that causation here is merely speculative.  Although we acknowledge that several of Steven's statements during his deposition *when viewed in isolation* could lead one to conclude that causation was speculative, when Steven's deposition testimony is read *as a whole* causation is not speculative.  For example, when first asked what caused him to fall Steven stated that he "hit this -- well, at the time *I didn't know* what it was, but it ended up later I saw there was a groove in the road." (Steven Wood Depo. at 31) (emphasis added).  Later, when asked again what caused his bike to crash, Steven testified, "I think *I do*. That morning I didn't know." (Id. at 61) (emphasis added).  Just after making this statement, however, Steven states that the cause of his accident was "a 90-degree arc right where my wheel hit and it had taken the bike right out from underneath me." (Id. at 61).  Like the trial court, we are presented with a cold deposition transcript, not live testimony, and cannot determine whether phrases like "I think I do," which appear throughout Steven's deposition testimony are definitive or equivocal statements by evaluating Steven's vocal inflections or facial gestures.  The standard of review, however, alleviates

this problem because we must evaluate Steven's testimony in light most favorable to him as the non-moving party. Civ.R. 56(C); *State ex rel. Cassels*, 69 Ohio St.3d at 219. Viewing Steven's deposition testimony in a light most favorable to him as the non-moving party, we cannot conclude *as a matter of law* that his testimony as to causation is merely speculative.

{¶20} As a further matter, we cannot agree with the trial court's conclusion that Steven's affidavit did not create a material issue of fact precluding summary judgment.

{¶21} In *Byrd v. Smith*, the Ohio Supreme Court stated:

> **We agree with the sentiment expressed in *Lemaster v. Circleville Long Term Care, Inc.* (Feb. 22, 1988), Pickaway App. No. 87 CA 2, 1988 WL 17187, \*3: "Ordinarily under [Civ.R] 56(C), when an affidavit is inconsistent with affiant's prior deposition testimony as to material facts and the affidavit neither suggests affiant was confused at the deposition nor offers a reason for the contradictions in her prior testimony, the affidavit does not create a genuine issue of fact which would preclude summary judgment."** *We hold that an affidavit of a party opposing summary judgment that contradicts former deposition testimony of that party may not, without sufficient explanation, create a genuine issue of material fact to defeat a motion for summary judgment.*

110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, ¶28 (emphasis added). Relying upon *Byrd*, supra, the trial court concluded that Steven's affidavit contradicted his depositional testimony without any explanation, and therefore, did not create a material issue of fact precluding summary judgment. (July 1, 2009 JE, Doc. No. 42).

{¶22} Although the trial court's citation of law was correct, it erred in its application of the law to the facts sub judice. Steven's affidavit merely summarized and, if anything, *supplemented* his depositional testimony. Steven averred, in pertinent part:

> **\* \* \* The photo as Exhibit 1 shows truly and accurately a repaired circular gouge in the roadway of the trailer park where my bike was jerked from under me. It is the dark curved patch in the upper center of the photo. The large older repair is the patch from the waterline repair. At the time of my fall the gouge had not been repaired. This gouge is in the street in front of the office manager's office for the park. The gouge was 2 to 3 inches deep and was such that a bicycle tire would just fit and be grabbed by the gouge, forcing the wheel to the right. This is what happened to me as the bike jerked from under me.**

(Doc. No. 33, Ex. A). During his deposition, Steven testified about the location and cause of the accident as follows:

> **There had been repair done to – I'm assuming it was probably a water line underneath the road. They had that area excavated. There was an area approximately six foot square that they had cut the pavement out, dug up, worked on a pipe. I'm assuming it was a pipe because quite often there are city water line problems in the park. That repair had been -- they probably had it barricaded off previously. It had been repaired and repaved. There was new asphalt there. I knew I could assume that I could ride over that as the barricades were gone. The asphalt had been – the pavement had been redone so it was open.**
>
> **As I rode over that area, my bike was just jerked right out from underneath me and then when I came back from the hospital, like I said, I had my daughter stop the car. I looked at it to see why that would have happened and in the daylight I could see this 90-degree arc. \* \* \***

(Steven Wood Depo. at 63-64). Steven identified the location of the accident as being "right in front of the park office." (Id. at 63). Steven also testified concerning the size of the gouge in the road as being "a little wider than my tire and several inches deep." (Id. at 61). Steven testified that his wheel hit this groove or "90-degree arc," pulled his front bike wheel sharply to the right, and took the bike right out from underneath him. (Id. at 31, 61, 71-72). Throughout his deposition, Steven maintained that this "90-degree arc" or gouge in the road was the cause of his bicycle accident. As such, we cannot conclude that Steven's affidavit contradicted his depositional testimony; and therefore, the affidavit does raise a question of fact regarding the cause of the accident sufficient to survive summary judgment.

{¶23} For all the aforementioned reasons, the Woods' assignment of error is sustained.

{¶24} Having found error prejudicial to the appellant herein in the particulars assigned and argued, we reverse the judgment of the trial court.

*Judgment Reversed and*
*Cause Remanded*

**WILLAMOWSKI, P.J. and SHAW, J., concur.**

**/jlr**