[Cite as *Vasquez-Cromer v. Toledo*, 2019-Ohio-5149.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

| | |
|---|---|
| Maggie Vasquez-Cromer, et al. | Court of Appeals No. L-18-1266 |
| Appellants | Trial Court No. CI0201703556 |
| v. | |
| City of Toledo | **DECISION AND JUDGMENT** |
| Appellee | Decided: December 13, 2019 |

* * * * *

Charles E. Boyk, Michael A. Bruno and Kathleen R. Harris,
for appellants.

Dale R. Emch, Director of Law, and Jeffrey B. Charles, Chief
of Litigation, for appellee.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal from a judgment of the Lucas County Court of Common

Pleas which granted appellee's motion for summary judgment. For the reasons set forth

below, this court affirms the judgment of the trial court.

{¶ 2} On August 1, 2017, appellants Maggie Vasquez-Cromer and Joseph Cromer filed a complaint with jury demand against appellee setting forth claims of negligence, recklessness, and loss of consortium. Mrs. Vasquez-Cromer alleged she suffered physical injuries and property loss on February 26, 2016, on South Detroit Avenue in Toledo, Lucas County, Ohio, from driving her car into a large pothole at 650 South Detroit Avenue, which caused her to lose control of the car she was driving and then collide with a bridge guardrail some distance past—and on the opposite side from—the pothole. Appellee generally denied the allegations and asserted the affirmative defense of political subdivision immunity. Following a period of discovery by the parties, appellee filed a motion for summary judgment, which appellants opposed. On November 20, 2018, the trial court granted appellee's motion. Appellants then filed this appeal setting forth one assignment of error:

> I. The Lucas County Court of Common Pleas ("Trial Court") erred to the prejudice of the Plaintiffs/Appellants when it found that there were no genuine issues of material fact as to whether the City of Toledo had actual or constructive notice of the pothole Maggie Vasquez-Cromer struck on S. Detroit Avenue and granted the City of Toledo's Motion for Summary Judgment on its claim for immunity.

2.

## I. Standard of Review

{¶ 3} Appellate review of trial court summary judgment determinations is de novo, employing the same Civ.R. 56 standard as trial courts. *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, 936 N.E.2d 481, ¶ 29.

{¶ 4} Summary judgment may be granted only:

if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor.

Civ.R. 56(C).

{¶ 5} When seeking summary judgment, a party must specifically delineate the basis upon which the motion is brought and identify those portions of the record that affirmatively demonstrate the absence of a genuine issue of material fact—not the reliance on conclusory assertions that non-movant has no evidence to prove its

3.

case—regarding an essential element of the non-movant's case. *Beckloff v. Amcor Rigid Plastics USA, LLC*, 6th Dist. Sandusky No. S-16-041, 2017-Ohio-4467, ¶ 14. When a properly supported motion for summary judgment is made, an adverse party may not rest on mere allegations or denials in the pleadings, but must respond with specific facts showing that there is a genuine issue of material fact for trial in accordance with Civ.R. 56(E). *Id*.

{¶ 6} A "material" fact is one which would affect the outcome of the suit under the applicable substantive law. *Id*. The "piling" of inference upon inference amounts to speculation and does not create a material issue of fact to defeat summary judgment. *Moore v. Ohio Valley Coal Co.*, 7th Dist. Belmont No. 05 BE 3, 2007-Ohio-1123, ¶ 45; *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 115, 526 N.E.2d 798 (1988), citing Civ.R. 56(E). Inferences in summary judgment that require "multilevel stacking * * * are pure speculation or impermissible inferences upon inferences." *Nageotte v. Cafaro Co.*, 160 Ohio App.3d 702, 2005-Ohio-2098, 828 N.E.2d 683, ¶ 51 (6th Dist.); *Sollo v. Goodnight Inn, Inc.*, 6th Dist. Sandusky No. S-96-049, 1998 WL 15628, *4 (Jan. 16, 1998) (speculation, conjecture, and inference upon inference are not permissible summary judgment evidence); *Wood v. Crestwood Assoc., L.L.C.*, 3d Dist. Allen No. 1-09-37, 2010-Ohio-1253, ¶ 13 (no inference of negligence where guessing, speculation or wishful thinking offered without proof of facts from which such inference can reasonably be drawn).

4.

## II. Political Subdivision Immunity

{¶ 7} It is well-settled that "a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental * * * function." R.C. 2744.02(A)(1); *Hubbard v. Canton City School Bd. of Edn.*, 97 Ohio St.3d 451, 2002-Ohio-6718, 780 N.E.2d 543, ¶ 10.

{¶ 8} "The issue of whether sovereign immunity is applicable in a particular case is properly determined by a court as a matter of law before trial, and is the proper subject of a summary judgment motion." *Grinter v. Toledo*, 6th Dist. Lucas No. L-98-1269, 1999 WL 740268, *2 (Mar. 19, 1999), citing *Nease v. Med. College Hosp.*, 64 Ohio St.3d 396, 400, 596 N.E.2d 432 (1992).

{¶ 9} Political subdivision immunity analysis has four parts, but is frequently referred to as a three-tiered analysis when the status of the defendant as a political subdivision is undisputed. *Pelletier v. Campbell*, 153 Ohio St.3d 611, 2018-Ohio-2121, 109 N.E.3d 1210, ¶ 15.

> In determining whether appellee is entitled to sovereign immunity pursuant to R.C. Chapter 2744, we must answer four questions. We must first determine: (1) whether or not appellee is a political subdivision, (2) whether appellee was engaged in a governmental or proprietary function, (3) if any of the exceptions to the general grant of immunity under

R.C. 2744.02(B) apply, and (4) whether appellee is entitled to a defense or qualified immunity under R.C. 2744.03(A).

*Beck ex rel. Estate of Beck v. Adam Wholesalers of Toledo, Inc.*, 6th Dist. Sandusky No. S-00-038, 2001 WL 1155820, *3 (Sept. 28, 2001).

## A. Political Subdivision and Governmental Function

{¶ 10} First, it is undisputed in the record appellee is a political subdivision. R.C. 2744.01(F).

{¶ 11} Second, it is also undisputed appellee has a governmental function to maintain and repair public roads within its borders. R.C. 2744.01(C)(2(e) and 2744.01(H); *Haynes v. Franklin*, 95 Ohio St.3d 344, 2002-Ohio-2334, 767 N.E.2d 1146, ¶ 10. The parties do not dispute South Detroit Avenue is a public road located within appellee's municipal limits. Therefore, pursuant to R.C. 2744.02(A)(1), appellee is entitled to immunity from liability in damages in appellants' civil action for injury or loss allegedly caused by any act or omission of appellee or its employee in connection with the governmental function to maintain and repair public roads within its borders.

## B. Exceptions to Immunity

{¶ 12} Third, we next must determine if, despite appellee's immunity, any of the exceptions under R.C. 2744.02(B) apply and if any defense in that section protects appellee from liability. *Pelletier* at ¶ 15.

6.

{¶ 13} R.C. 2944.02(B)(3) identifies two exceptions to immunity, each rooted in negligence. It is not a strict liability statute. *Nageotte*, 160 Ohio App.3d 702, 2005-Ohio-2098, 828 N.E.2d 683, at ¶ 52.

> Subject to sections 2744.03 and 2744.05 of the Revised Code, a political subdivision is liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by an act or omission of the political subdivision or of any of its employees in connection with a governmental * * * function, as follows: * * * Except as otherwise provided in section 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property caused by their negligent failure to keep public roads in repair and other negligent failure to remove obstructions from public roads * * *.

R.C. 2944.02(B)(3). The current version of R.C. 2744.02(B)(3), effective April 2003, is often referred to as "amended R.C. 2744.02(B)(3)." *Howard v. Miami Twp. Fire Div.*, 119 Ohio St.3d 1, 2008-Ohio-2792, 891 N.E.2d 311, ¶ 24.

{¶ 14} We are guided by the Ohio Supreme Court that by enacting amended R.C. 2744.02(B)(3) "the General Assembly purposely replaced the phrase 'free from nuisance' with 'other negligent failure to remove obstructions.' To find otherwise is to conclude that the legislature's action in amending the statute was a superfluous act." *Id.* at ¶ 25. "We are persuaded that the legislature's action in amending R.C. 2744.02(B)(3) was not

7.

whimsy but a deliberate effort to limit political subdivisions' liability for injuries and deaths on their roadways." *Id.* at ¶ 26.

{¶ 15} We are also guided by the Ohio Supreme Court that "[m]unicipal corporations are not insurers of the safety of their public ways, and are liable only for negligence in creating a faulty condition in such ways, or in failing to repair, remove or guard against defects or obstructions therein, after actual or constructive notice of their existence." *Taylor v. City of Cincinnati*, 143 Ohio St. 426, 55 N.E.2d 724 (1944), paragraph five of the syllabus.

{¶ 16} To prove negligence, appellants have the burden to establish: (1) a duty of care by appellee to appellants, (2) breach of that duty, and (3) injury proximately caused from the breach. *Menifee v. Ohio Welding Products, Inc.*, 15 Ohio St.3d 75, 77, 472 N.E.2d 707 (1984). If appellants fail to meet their burden to prove negligence by appellee, appellee is not liable for the "substantially greater" conduct which is necessary to make its conduct reckless. *Anderson v. City of Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, paragraph four of the syllabus.

> The existence of a duty depends on the foreseeability of the injury. The test for foreseeability is whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act. The foreseeability of harm usually depends on the defendant's knowledge. In determining whether appellees should have recognized the risks involved, only those circumstances which they

8.

perceived, or should have perceived, at the time of their respective actions should be considered. Until specific conduct involving an unreasonable risk is made manifest by the evidence presented, there is no issue to submit to the jury.

*Menifee* at 77.

{¶ 17} For summary judgment purposes, unless appellants submit evidence of appellee's knowledge of the pothole at 650 South Detroit Avenue before the February 26, 2016 incident and the danger it posed, they fail to show a critical element of their negligence claim against appellee. "[W]here negligence revolves around the question of the existence of a hazard or defect, the legal principle prevails that notice, either actual or constructive, of such hazard or defect is a prerequisite to the duty of reasonable care." *Heckert v. Patrick*, 15 Ohio St.3d 402, 405, 473 N.E.2d 1204 (1984). This court has consistently held that actual or constructive notice is a prerequisite to R.C. 2744.02(B)(3) liability. *Estate of Beck*, 6th Dist. Sandusky No. S-00-038, 2001 WL 1155820, at *5, citing *Harp v. City of Cleveland Heights*, 87 Ohio St.3d 506, 513, 721 N.E.2d 1020 (2000); *DiRando v. Toledo*, 6th Dist. Lucas No. L-94-312, 1995 WL 386475, *6 (June 30, 1995), citing *Beebe v. Toledo*, 168 Ohio St. 203, 151 N.E.2d 738 (1958), paragraph two of the syllabus; *Kertesz v. Fulton Cty.*, 6th Dist. Fulton No. F-05-026, 2006-Ohio-3178, ¶ 14.

{¶ 18} Constructive notice is found if the pothole at 650 South Detroit Avenue existed prior to the February 26, 2016 incident in such a condition that it could or should

9.

have been discovered by appellee, that the pothole existed for a sufficient length of time to have been discovered by appellee, and that if the pothole had been discovered it would have created a reasonable apprehension of a potential danger. *Consumer Portfolio Servs., Inc. v. Staples*, 6th Dist. Sandusky No. S-06-031, 2007-Ohio-1531, ¶ 25, citing *Harp* at 512.

### 1. Keeping Public Roads "in Repair"

{¶ 19} The first potential exception to appellee's immunity is for negligently failing to repair the subject pothole.

> Pursuant to R.C. 2744.02(B)(3), the city may be held liable for injuries caused by its negligent failure to keep public roads "in repair." The statute does not define the phrase "in repair," and we construe it according to its common usage. In this context, the word "repair" means "the state of being in good or sound condition." (Citations omitted.)

*Pelletier*, 153 Ohio St.3d 611, 2018-Ohio-2121, 109 N.E.3d 1210, at ¶ 19. The "in repair" duty under R.C. 2744.02(B)(3) includes repairing "'potholes that deteriorate into a potentially hazardous condition.'" *Lakota v. Ashtabula*, 11th Dist. Ashtabula No. 2015-A-0010, 2015-Ohio-3413, ¶ 26, quoting *Todd v. Cleveland*, 8th Dist. Cuyahoga No. 98333, 2013-Ohio-101, ¶ 15. Nevertheless, "a mere pothole on the road of which the city had no knowledge" does not trigger the "in repair" duty under R.C. 2744.02(B)(3). *Id.* at ¶ 40.

10.

## 2. Removing Obstructions from Public Roads

{¶ 20} The second potential exception to appellee's immunity is for negligently failing to remove the pothole obstruction. *Pelletier* at ¶ 23. The duty "'to remove obstructions from public roads' under R.C. 2744.02(B)(3) extends only to 'an obstacle that blocks or clogs the roadway and not merely a thing or condition that hinders or impedes the use of the roadway or that may have the potential to do so.'" *Id.* at ¶ 24, quoting *Howard*, 119 Ohio St.3d 1, 2008-Ohio-2792, 891 N.E.2d 311, at ¶ 30. "We adhere to our holding in *Howard* explaining what an obstruction is." *Id.* at ¶ 25. "The General Assembly, in furtherance of its goal, used the word 'obstructions' in a deliberate effort to impose a condition more demanding than a showing of a 'nuisance' in order for a plaintiff to establish an exception to immunity." *Howard* at ¶ 29. This court previously observed liability in negligence does not automatically attach upon evidence of the mere existence of a pothole found "in northwest Ohio in February." *Nageotte*, 160 Ohio App.3d 702, 2005-Ohio-2098, 828 N.E.2d 683, at ¶ 52.

### C. Constructive Notice

### 1. Appellee's Support of Summary Judgment

{¶ 21} Appellee argued summary judgment was proper because appellants failed to introduce evidence in the record that appellee had either actual or constructive notice of the pothole at 650 South Detroit Avenue prior to the February 26, 2016 incident. In support of summary judgment, we review appellee's evidence pursuant to Civ.R. 56(C) and (E).

11.

{¶ 22} Appellee provided affidavits from employees Vince Semler, Jeff Smith, Dean Kohne, and Tom O'Connor. Vince Semler and Dean Kohne each averred they worked together on February 8, 2016, when they tore down the house at 650 South Detroit Avenue, and no pothole was present. Jeff Smith and Tim O'Connor each averred they worked together on February 22, 2016, when appellee hauled away the debris from the demolished house at 650 South Detroit Avenue, and no pothole was present.

{¶ 23} Appellee also provided an affidavit from Officer Mark Pollauf, a patrolman for appellee's police department, in which he averred the pothole he observed at 650 South Detroit Avenue was not dangerous. He responded to the accident scene on February 26, 2016, and "[w]hile at the scene I observed many vehicles driving over the pothole Plaintiff Maggie Vasquez Cromer alleges caused her to lose control. No vehicle had any difficulty with the pothole whatsoever. No vehicle lost control nor swerved nor displayed any control difficulties while driving over the pothole."

{¶ 24} In addition, the depositions of appellants Mr. Cromer and Mrs. Vasquez-Cromer are in the record, and both of them did not see the pothole at 650 South Detroit Avenue before her accident.

{¶ 25} Mr. Cromer testified as follows at his June 28, 2018 deposition:

Q: Before this accident happened did you ever call the City of Toledo and report this pothole that your wife allegedly hit?

A: No.

Q: Do you know anybody that did?

12.

A:  No.

Q:  Do you have any evidence at all that would suggest the city knew of that pothole before she hit it?

A:  No, I don't.

Q:  Have you talked to anybody that said they knew about the pothole before she hit it?

A:  No.

{¶ 26} Mr. Cromer further admitted that on February 26, 2016, immediately after his wife called him from the accident scene, he took cell phone videos and pictures of the pothole at issue showing the pothole was not dangerous.

Q:  I am showing you right now some video of a pothole.  Do you know who took this video?

A:  That's what I took.

Q:  Did you see the car that just went over the pothole?

A:  Yes.

Q:  Did they have any problem with the pothole?

A:  It doesn't appear to.

{¶ 27} Mrs. Vasquez-Cromer testified at her June 28, 2018 deposition as follows:

Q:  And you were headed to work [on February 26, 2016]?

A:  Yes.

13.

Q: And you drive that route all the time?

A: Every day.

Q: Before the accident happened did you ever see that pothole?

A: No.

Q: Did you ever call the city and say there's a pothole there?

A: No.

Q: Do you know anybody that did?

A: No.

Q: Did your husband?

A: No.

Q: Do you have any evidence whatsoever that would indicate that the city knew the pothole was there?

A: No.

Q: Do you know anybody that does?

A: No.

* * *

Q: Do you know where the pothole was?

A:      Not until I hit it.

Q: But afterwards you learned where it was?

A: Yes.

Q: Your testimony today is that you didn't see it, is that fair?

A: That's fair to say that I didn't see it until I became aware of the porthole when I hit it.

{¶ 28} In addition, Mrs. Vasquez-Cromer testified she was unsure of why she lost control of her car on February 26, 2016, but thought it might have been because of the pothole.

Q: Why did you lose control?

* * *

A: I have no idea.

Q: Did you panic?

A: No. I didn't see the pothole.

Q: But the question is why did you lose control of your vehicle?

A: I don't know how to answer that.

{¶ 29} Appellee provided an affidavit from Jeremy Mikolajczyk, appellee's commissioner in charge of day-to-day operations for the streets division, in which he averred that after reviewing all files and records kept by SBH pertaining to the subject pothole, "SBH was not put on notice of the subject pothole until after the subject accident occurred."

{¶ 30} Mr. Mikolajczyk also provided explanations of how it receives information about pothole problems, documents those problems, and of how it tracks and responds to those complaints. Appellee employs pothole crews who daily repair road defects.

15.

"Information as to where potholes are located is received by SBH in a variety of ways and as soon as a citizen complaint is received a crew goes out to inspect and repair the defect as needed. * * * Potholes are repaired on a daily basis year round. Potholes are also repaired by zones without the need for any complaint received." Mr. Mikolajczyk estimated in 2015, 78,143 potholes were filled and in 2016, 61,957 potholes were filled over 1,224 linear miles of streets and 119.50 miles of alleys.

{¶ 31} Appellee provided an affidavit from David Calzone, a general foreman with appellee's streets division, in which he averred that pothole complaints are received by three main methods: (1) reported by appellee work crews in the course of other duties, (2) citizen complaints made to Engage Toledo, and (3) citizen complaints directly to the streets division. The information is then entered into the Cityworks computer database for identification and response tracking. He averred, "[A]n SBH crew responds to the complaint or issue by having a crew sent out to examine the matter and repair if needed. Emergency repairs are completed as soon as possible."

{¶ 32} Appellee also provided an affidavit from Jenny Gogol, appellee's customer service manager, in which she averred that appellee staffs its Engage Toledo call center 24/7/365, which annually receives over 5,000 pothole, sinkhole and street condition complaints. Every report is entered into Cityworks, which automatically forwards the issue to the appropriate division for response. "The City of Toledo has recently received national recognition in 2016, 2017 and 2018 as a Designated Citizen-Engaged Community for its efforts * * * of providing quick and modern access to City services by

16.

using all available technologies to assist citizens in reaching out to us with their concerns and needs."

## 2. Appellants' Opposition to Summary Judgment

{¶ 33} We find appellee properly supported its motion for summary judgment, and the burden then shifted to appellants to respond with specific facts showing that there is a genuine issue of material fact for trial in accordance with Civ.R. 56(E).

{¶ 34} Appellants argue they successfully brought forth five genuine issues of material fact that appellee had either created the pothole or had constructive notice of the dangerous pothole:  (1) appellee's employees applied a temporary "cold patch" to the same pothole one year earlier; (2) photographic and video evidence of "the pothole's size and advanced state of deterioration" on the date of the accident showing a pothole depth that exposed "the road's concrete base, with crumbling debris inside it and around it, including cold patch and concrete" and pothole length that "was several feet long, took up about half a lane, and cars had to swerve dramatically to avoid it"; (3) appellee had six employees who "worked at the property adjacent to the pothole [four days before the accident] * * * driving upwards of 1,000,000 pounds of fully loaded heavy equipment in and out of the driveway over the pothole's location" such that "the pothole would already have been in a state of deterioration such that City workers should have seen it and acted to repair it"; (4) "expert testimony that the pothole did not appear overnight and would have been in a noticeable state of deterioration when the City employees worked at that [adjacent] site"; and (5) appellee's admission the pothole "was a 'high priority'

17.

one – deeper than four inches and known to City workers as a tire-buster – and the City knew a pothole like this could create a safety hazard."

{¶ 35} The record includes the depositions taken by appellants of appellee employees David Calzone, Gregory Robie, Charles Stimmage, and Thomas Metzger. They collectively testified they did not recall ever seeing a pothole at 650 South Detroit Avenue, and each separately testified as to different aspects of appellee's streets division operations.

{¶ 36} At his September 21, 2018 deposition, Mr. Calzone testified that, depending on the size of the structure, hauling away demolition debris takes from 4-12 hours. Debris is hauled away by either an excavator or a front-end track loader, and the debris is loaded into semis and tandem dump trucks. The lot at 650 South Detroit Avenue was large enough for the equipment to pull in using the driveway and not be on the street. Mr. Calzone was on site at 650 South Detroit Avenue prior to the tear down on February 8, 2016. He testified that according to appellee's records, the demolition permit was dated February 8, 2016; the tear down occurred on February 8, 2016; the hauling away of debris haul began on February 22, 2016, and continued on February 23, 2016, and the site restoration work to plant grass began on either June 25 or 26, 2016.

{¶ 37} At Mr. Robie's July 20, 2018 deposition, he testified he is a general foreman for appellee's streets division. He did not have any knowledge of a pothole at 650 South Detroit Avenue, even after being shown a photo of the pothole. He did not

recall, either individually or with his crew, ever repairing a pothole at 650 South Detroit Avenue.

{¶ 38} Mr. Robie testified with details about appellee's pothole repair operations. He described that pothole repairs occur year round to respond to citizen complaints or to what a crew finds in the field. He testified that according to appellee's records, the crew that received the dispatch call at 9:30 on the morning of February 26, 2016, arrived at the site of the pothole at 650 Soth Detroit Avenue by 9:45 that morning, "so that's a 15-minute response time which I think is pretty good."

{¶ 39} Mr. Robie further testified the main difference between summer and winter pothole operations is the type of fill material used, which depends on when the asphalt plants are open, not on outside temperatures. Even a "temporary" pothole fill material used in the winter may last a long time, and even a "permanent" pothole fill material used in the summer may not last a long time, depending on a number of factors that contribute to how well the material remains bound to the pothole. "Cold patch" is the material used when the asphalt plants are closed, is considered less elastic than "the summer stuff," and is generally considered a temporary fix, although "Sometimes it stays better than others." "Hot mix" is the material used when the asphalt plants are open and is expected to last "for a long time."

{¶ 40} Another pothole factor about which Mr. Robie testified is appellee's use of crack sealer, visible in at least one photo of the pothole in question used at the deposition. He described crack sealing as the ongoing laying down of strips of tar over pavement

19.

cracks.  He explained that is done to prevent water from entering the cracks to inhibit a pothole forming or a pothole repair from "popping up."

{¶ 41} At Mr. Stimmage's July 20, 2018 deposition, he testified he is a sweeper operator for appellee's streets division, but also bids on other jobs, including demolitions. He testified that in February "everyone does potholes."  He did not recall "ever going out and working at 650 South Detroit."  Nor did he recall "ever patching a pothole in front of it."

{¶ 42} Mr. Stimmage also described appellee's year-round pothole repair operations:  "We have a list. * * * Well, the list will say Dorr Street and from this section, maybe from Detroit to Byrne, so we just go down the street and fill every little hole from Detroit to Byrne one lane at a time."  When one area is completed, each crew moves on to another area with a new list of pothole repairs.

{¶ 43} Mr. Stimmage described a pothole is repaired the same way year-round, regardless of whether the fill material is "cold patch" or "hot mix":  "You clean the hole out, you fill the hole up. * * * With the hot mix.  You level it off, you tamp it down, make, pack it, and that's it, and then you go to the next pothole."  The same technique is used in the winter, except that you use "cold patch," which he described as, "[I]t looks like the hot mix but it's cold."

{¶ 44} Mr. Stimmage testified the "temporary" pothole fill material used in the winter may last a long time, and he could not predict when that will be.  Another pothole factor about which Mr. Stimmage testified is that as cars drive over a "cold patch," the

20.

repair gets better, "Because you can pack it, I mean like, you know, if a car rolls over it, it can pack it down in there."

{¶ 45} Thomas Metzger, a maintenance worker with appellee's streets division on the date of the accident, was deposed on September 21, 2018. He testified that, although he worked as a dispatcher on February 26, 2016, he was unfamiliar with the pothole or the accident at 650 South Detroit Avenue that generated a service request "a little after 9:00 in the morning." He testified, "Unfortunately, this one I don't recall. * * * I know I put the information in, obviously, according to the paper, but I don't recall how I came about the information, I mean * * * there's a few ways we can get it, um, but in this case I don't, I really honestly don't know."

{¶ 46} Mr. Metzger further testified that generally when complaints are received, "whether it be potholes or curb issues or snow and ice, leaves, everything that Streets deals with," he enters information into the Cityworks database for tracking and for a foreman to deploy a crew to investigate and repair. Mr. Metzger further testified that generally if the pothole service request shows it is a "high priority" it means he received that information from the caller: "If it's * * * large enough that it can do damage." The "4-inch mark" on the service request is also not something he determines: "I don't * * * know where they came about that number * * * I mean it's just in the system." He also testified that generally an orange barrel is placed, "When the pothole can create damage or it's in an area that could create a safety hazard that's when we would send the service truck out to place a barrel."

21.

{¶ 47} Appellants also provided an affidavit from Hal Goldman, appellants' expert on construction management and development, in which he averred to a reasonable degree of construction management and road maintenance certainty, that a cold patch "will come out over time as traffic and weather interact with it." When the cold patch fails, the pothole will reopen "and presents a danger to motorists." He further averred that appellee records show a cold patch at 650 South Detroit Avenue was applied one year prior to the accident, and photographs taken by Mr. Cromer immediately following the accident showed "cold patch has come out of the pothole to such an extent that the bottom layer of concrete is exposed." He concluded appellee was negligent because the size and depth of the pothole is evidence it "did not appear overnight."

{¶ 48} He also concluded appellee was negligent because appellee lacked a policy for identifying and tracking pothole repairs.

> To properly maintain its roads the City of Toledo should follow a policy of documenting the holes it fills with cold patch, removing the cold patch to do a more permanent asphalt patch during the warmer months, and monitoring holes filled with cold patch so that the City knows when they present a danger to motorists. Based on the materials reviewed, the City of Toledo does none of these things. As a conclusory observation, it is obvious beyond doubt that if the City of Toledo repaired the pothole with cold patch, it knew full well that the hole was there, and absolutely in need

22.

of permanent repair by the methods mandated by the State of Ohio. This clearly shows actual knowledge of a condition dangerous to the public.

{¶ 49} He also concluded appellee was negligent because appellee knew a temporary pothole repair simply does not last.

By using a cold patch system in which it knows that potholes will be re-exposed, and by letting that cold patch sit in the potholes for indefinite periods of time – including more than a year at 650 S. Detroit Ave. – the City of Toledo is creating a dangerous condition in which dangerous "tire buster" potholes will appear all across the City, presenting a danger to motorists.

### 3. Analysis

{¶ 50} The evidence we review for summary judgment purposes must contain admissible facts. Civ.R. 56(C) and (E). However, to reach the negligence conclusions appellants urge us to reach, we are required to impermissibly make inference upon inference of appellee's actual or constructive knowledge of the dangerous pothole at 650 South Detroit Avenue before the February 26, 2016 incident. Such stacked inferences are not admissible facts.

{¶ 51} We find appellants argue that evidence generated after the February 26, 2016 incident is evidence of appellee's negligence, particularly Mr. Cromer's photos and videos of an orange barrel in the pothole and of the pothole condition, along with appellee's service request form showing the pothole repair as a "high" priority.

23.

However, Evid.R. 407 precludes our consideration of evidence of subsequent remedial measures because such evidence "is not admissible to prove negligence or culpable conduct in connection with the event."

{¶ 52} In addition, appellants seek to establish that appellee was on notice of the dangerous pothole. Appellants argue, "Plaintiffs/Appellants do not contend that the City SBH department was directly notified in 2016 of the pothole at issue prior to Maggie Vasquez-Cromer's accident, but actual notice liability can also be proven if the municipality or its officers actively created the faulty condition." To support their allegation appellee created the pothole, they point to "deep tire marks" shown in Mr. Cromer's photos and videos taken after the accident on February 26, 2016. "If, as can be inferred from the tire tracks, the driveway was used in the demolition haul-away on February 22, the City employees drove heavy equipment directly over the pothole location days before Maggie Vasquez-Cromer's jaw-shattering accident." Appellants urge us to infer not only that appellee alone made those tire marks, but also that the marks were the result of appellee's equipment in performing yet another potential governmental function pursuant to R.C. 2744.01(C)(2)(q) to which immunity may attach.

{¶ 53} By accepting as true appellants' facts of the existence on February 26, 2016, of both: (1) "deep" tire marks at 650 South Detroit Avenue, and (2) a pothole greater than four inches near the driveway, and to reach appellants' conclusion of appellee liability, we are required to infer that the pothole was dangerous, i.e., that it was foreseeable that someone encountering it might be injured. But appellants provide no

24.

facts that appellee knew of the pothole's existence prior to the February 26, 2016 incident, nor any facts of the pothole's dangerous condition prior to the accident. Appellee and both appellants first learned of the pothole and the danger it posed after Mrs. Vasquez-Cromer's accident. Appellants also admitted that immediately after the accident, a car was observed in Mr. Cromer's video passing over the pothole without incurring damage or injury. A police officer also testified that immediately after the incident he observed cars passed over the pothole with no difficulty, and none swerved or lost control of their vehicles.

{¶ 54} We are also required to infer that Mrs. Vasquez-Cromer could not have avoided the dangerous pothole. Appellants provide no facts about why she lost control of her car on February 26, 2016. At best she made a further inference it was because of hitting the pothole.

{¶ 55} We are also required to infer that the pothole had existed in its dangerous condition long enough for appellee to know or should have known of its existence. To do so, appellants urge us to make a further inference that because a "deep" pothole of an undetermined size and condition existed at 650 South Detroit Avenue in February 2015, the pothole was "dangerous." We must then further infer that despite the evidence the pothole was repaired with "cold patch" in February and in March 2015, the pothole remained continuously dangerous because a "cold patch" is "temporary." We must then infer that "temporary" meant only until the summer of 2015 according to Mr. Goldman because he opinioned, without any specificity, that at some point in the future every "cold

25.

patch" in a pothole will "come out" because of traffic and weather conditions, meaning that motorists are in "obvious" danger. This, in turn, requires us to infer that every pothole in Ohio, regardless of the underlying factors of its condition, is an automatic danger to motorists, which is an improper strict liability standard. We must further infer the pothole grew in size and depth between February 2015 and February 26, 2016, to be more than four-inches deep, as wide as nearly half a lane of travel, and spanned a car length, despite Mrs. Vasquez-Cromer admitting she drove past 650 South Detroit Avenue every day and never noticed the allegedly dangerous, growing, and now massive pothole.

{¶ 56} We must then infer that the dangerous pothole at 650 South Detroit Avenue was continuously and obviously in need of filling with a "permanent" material since the summer of 2015, which appellee did not have an adequate policy or program to do. Mr. Goldman opined, "Based on the materials reviewed, the City of Toledo does none of these things." But the record contains evidence of appellee's year-round pothole repair operations to receive, respond, and track street issues, including national recognition for its customer service. The facts also show that within 15 minutes of being notified of the February 26, 2016 incident, appellee's pothole crew was on site placing an orange barrel to warn vehicles. Appellants must produce something more than a mere denial of appellee's evidence. Mr. Goldman's opinion is based on an inference that the pothole at 650 South Detroit Avenue was an obvious danger to motorists ever since the application of the February 2015 "cold patch," but there is no evidence that the "cold patch" was performed incorrectly or was confidently predicted to fail by February 26, 2016. In fact

26.

the opposite inference can be made that a road is made safer for motorists because a "cold patch" fills in and binds with the pothole, and the cars traveling over the repaired pothole help.

{¶ 57} After a de novo review of the record, we find appellants failed to provide sufficient evidence to support a direct finding or reasonable inference that prior to the February 26, 2016 incident, appellee:  1) negligently failed to cause the road in front of 650 South Detroit Avenue be "in repair," i.e., a state of being in good or sound condition, or 2) negligently failed to remove an obstruction, i.e., an obstacle that blocked or clogged the roadway the road in front of 650 South Detroit Avenue.  It is undisputed that immediately following the February 26, 2016 incident, vehicles continued to pass over the pothole in front of 650 South Detroit Avenue without problems.

### D.  R.C. 2744.03(A)(5) Defense

{¶ 58} We are mindful that for the last part of political subdivision immunity analysis, if appellants fail to show that any of the five (5) enumerated exceptions to immunity apply to appellee for the pothole under R.C. 2744.02(B), appellee's immunity from liability remains intact, and we do not review whether appellee can assert a defense pursuant to R.C. 2744.03(A)(5) to revive its immunity.  *Colbert v. Cleveland*, 99 Ohio St.3d 215, 2003-Ohio-3319, 790 N.E.2d 781, ¶ 9; *Howard*, 119 Ohio St.3d 1, 2008-Ohio-2792, 891 N.E.2d 311, at ¶ 18.

27.

## III. Conclusion

{¶ 59} In our de novo review of the record we find appellee had a duty to maintain, repair, and remove obstructions from public roads within its borders, but it did not breach that duty on February 26, 2016, with respect to the pothole at 650 South Detroit Avenue. We do not find appellants met their burden to create any issues of fact that were both genuine and material to establish appellee is not immune from liability, and appellee is entitled to judgment as a matter of law. We find appellee is immune from liability from appellants' claims pursuant to R.C. 2744.02(A)(1). We further find appellants failed to show an exception to appellee's immunity pursuant to R.C. 2744.02(B)(3), and that failure acts as a complete bar to appellants' negligence and reckless claims. Appellants' sole assignment of error is found not well-taken.

{¶ 60} On consideration whereof, this court finds that there remain no genuine issues of material fact and, after construing all the evidence most strongly in favor of appellants, reasonable minds can come to but one conclusion that appellee is entitled to summary judgment as a matter of law. The judgment of the Lucas County Court of Common Pleas is affirmed. Appellants are ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

28.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Arlene Singer, J.

Thomas J. Osowik, J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.