[Cite as *Ohio Bell Tel. Co. v. Cleveland*, 2013-Ohio-270.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 98683**

## OHIO BELL TELEPHONE CO.

PLAINTIFF-APPELLEE

vs.

## CITY OF CLEVELAND

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Common Pleas Court
Case No. CV-732218

**BEFORE:** S. Gallagher, P.J., Rocco, J., and Keough, J.

**RELEASED AND JOURNALIZED:** January 31, 2013

**ATTORNEYS FOR APPELLANT**

Barbara A. Langhenry
Interim Director of Law
City of Cleveland
By: John Mills
Assistant Director of Law
601 Lakeside Avenue, Room 106
Cleveland, OH    44114


**ATTORNEYS FOR APPELLEE**

William H. Hunt
W.H. Hunt Legal Group, LLC
24500 Center Ridge Road
Suite 170
Westlake, OH    44145

Edward L. Bettendorf
45 Erieview Plaza
Suite 1400
Cleveland, OH    44114

SEAN C. GALLAGHER, P.J.:

{¶1} Appellant, city of Cleveland ("the City"), appeals the decision of the Cuyahoga County Court of Common Pleas that denied its motion for summary judgment. For the reasons stated herein, we affirm.

{¶2} Appellee, The Ohio Bell Telephone Company ("Ohio Bell"), filed this action against the City alleging claims of negligence. Ohio Bell alleged that the City negligently damaged its underground utility facilities while performing excavation in connection with the water main leak on Pearl Road in Cleveland on June 1, 2009. Ohio Bell also sought damages resulting from contemporaneous flooding to its nearby central office. The complaint was later amended to include specific allegations of wanton and reckless conduct.

{¶3} The City filed a motion for summary judgment, as well as a subsequent amended motion for summary judgment. The City claimed, in part, that it was entitled to statutory immunity under R.C. 2744.03(A)(5). Ohio Bell opposed the motion. The trial court denied the motion.

{¶4} The trial court aptly set forth the factual background of the case as follows:

**Factual background**

**A.** *Ohio Bell's allegations*

Ohio Bell is a public utility doing business as AT&T Ohio, which owns underground utility facilities[1] buried throughout the state and Cuyahoga County. (Second Am. Compl., ¶¶ 1-4; Answer to Sec. Am. Compl., ¶ 1.) Ohio Bell alleges that while the City was working on an

"excavation/construction project" along an area of Pearl Road on June 1, 2009, water leaked into Ohio Bell's Shadyside central office located nearby. (Second Am. Compl., ¶ 5.)

> [Footnote 1]   "Underground utility facility" is statutorily defined as "any item buried or placed below the surface of the earth or submerged under water for use in connection with the storage or conveyance of water or sewage; electronic, telephonic, or telegraphic communications; television signals; electricity; crude oil; petroleum products; artificial or liquefied petroleum; natural gas; coal; steam; hot water; or other substances * * *."   R.C. 3781.25(B).   Such facilities come within the ambit of the Underground Facilities Protection Service and Excavations Act, R.C. 3781.25 *et seq.*

Ohio Bell first alleges that the City engaged in a number of negligent acts which, in addition to the office leak, caused damage to its underground utility facilities;

> (1)    The City "failed to maintain reasonable clearance between [Ohio Bell's] underground utility facilities and the cutting edge or point of powered equipment"; and

> (2)    The City "failed to preserve and protect the markings of the approximate location of [Ohio Bell's] underground facilities and otherwise failed to excavate in a careful and prudent manner," in breach of common-law and statutory standards. (Second Am. Compl., ¶ 9; *id.* ¶¶ 5 & 9.)

Ohio Bell also claims that the City's "excavation in the near and clearly visible proximity to [Ohio Bell's] facilities was wanton and reckless without any regard for the protection of [Ohio Bell's] property." (Second Am. Compl., ¶ 13.)   Ohio Bell seeks $105,378.90 in damages, which represents the "reasonable cost of restoration and loss of use" between the date of damage and the date Ohio Bell completed its restoration. (*Id.* at ¶¶ 10 & 14.)

### B. *Record evidence*

### 1. The City's submission

In support of its amended motion for summary judgment, the City submits the affidavit of Brian Campbell, a City Division of Water employee who "performs repairs on City water infrastructure throughout Northeast Ohio." (Am. MSJ, Ex. A., ¶¶ 1 & 3.) [Footnote omitted.] Campbell states that he was "dispatched" to the site at issue on June 1, 2009 "to locate the site of a water main break beneath the road surface." (Am. MSJ, Ex. A, ¶¶ 1 & 5.) He "observed at the location that the conditions were creating an emergency in need of immediate attention." (*Id.* at ¶ 5.) "Using a rotary tool, [Campbell] drilled through the top two to three feet of pavement only." (*Id.* at ¶ 6.) Then, "[w]ithout the aid of a mechanical device, [he] inserted test rods into the drilled holes to a depth of about nine feet, in order to find the location of the break." (*Id*. at ¶ 7.) In other words, Campbell successfully inserted the test rods an additional 6 to 7 feet through earth and other subsurface matter to a depth of about 9 feet.

Campbell then opines that his conduct was not negligent, asserting that "[a]t all times while I was at the location";

(1) "I used all equipment in a manner consistent with industry standards." (Id. at ¶ 8.)

(2) "I exercised all due care in the use of the equipment." (*Id.* at ¶ 9.)

(3) "I exercised all due care in observing any markings designating underground utilities." [*Id.* at ¶ 10.]

### 2. Ohio Bell's submission

### a. *City work orders*

In opposition to summary judgment, Ohio Bell submitted work orders and a follow-up work order that the City had produced in discovery. (Brief Contra Am. MSJ, Ex. 7, ¶ 2.) The work order of J. Lally, who apparently is a Division of Water investigator, provides that he arrived on the scene at 6:00 p.m. on June 1, 2009. (*Id.*, Ex. 1, unnumbered p.1.) He states that he "found bad leak on main[.] Investigate found [leak] on [east] side of Pearl[.] Called for crew & located couple [line valve], for crew

pipe repair arrived made prc[?]." (*Id.*) Lally's notes indicate that he left at 8:45 p.m. (*Id.*)

Campbell's work order indicates that he arrived at the site at 7:30 p.m. on June 1, 2009 (about 1½ hours after Lally) to investigate a "bad leak" on the 10" water main. (*Id.* at Ex. 2, p. 1.) His notes indicate, in part, that he "located line valve[;] got [measurements] for main[;] drilled test hole [;] street very thick[;] had hard time trying to hit pipe[;] drilled test holes till relief crew [arrived]." (*Id.* at Ex. 2, p 1.] Campbell left at 1:15 a.m. the next morning after being relieved by Randall Barkley. (*Id.*) Although the main apparently had not been turned off by the time Campbell left the site, he had contacted Ohio Underground Utility Protection Services ("OUPS")[3] at some point during his almost six-hour stay. (*Id.*)

> [Footnote 3] The OUPS exists under R.C. 3781.25 et seq., to prevent excavators and others from damaging underground utility facilities. An excavator has a duty under R.C. 3781.28 to notify the OUPS about proposed excavations. The OUPS will then send out a marking service provider to mark the location of underground utility facilities before excavation.

Barkley's follow-up work order dated June 2, 2009 indicates that he arrived at 1:15 a.m. and exchanged paperwork with Campbell. (*Id.* at unnumbered p. 3) Barkley then took his own measurements and began to drill test holes. (*Id.*) Drilling stopped to "turn a 10" valve off so OUPS could mark out a utility." (*Id.*) This follow-up work order indicates that the main was turned off at 5:40 a.m. and that drilling resumed when OUPS completed its marking. (*Id.*)

According to Barkley, "We got stopped again by AT&T with regards to water flooding their building & potential to knock out service for the city. We stopped drilling & began locating [&] shutting off line valves." (*Id.*) Barkley explained that "[w]e had to jack-hammer a valve out & flush out the hv [?] at State Rd." (*Id.*) After shutting the main down, the crew "assisted AT&T with pumping two of there [sic] vaults down by our job site." (*Id.*)

**b.** *Affidavits* [Footnote omitted.]

*i.* **Utility locators**

Ohio Bell also submitted in opposition to summary judgment the affidavits of two United States Infrastructure Corporation ("USIC")

employees: (1) Lawrence Jackson, a "locator" who locates and marks underground utility facilities; and (2) Noah Wemmer, presently a supervisor who served as an "investigator" at the time of the incident, investigating damage to telephone facilities. (Brief Contra MSJ, Ex. 4, ¶¶ 1-2, & Ex. 5, ¶¶ 1-2.) Jackson states that he received a call at almost 8:00 p.m. on June 1, 2009 "to perform utility locates" at the Pearl Road site. (*Id.* Ex. 4 at ¶ 4.) He arrived shortly before 8:30 p.m. and "observed numerous holes already drilled in the pavement in the area [he] was assigned to locate and mark." (*Id.* at ¶¶ 5 & 7.) "A steel poker rod was in one of the test holes," and he observed "a telephone company manhole approximately 5 feet from the location of the test holes." (*Id.* at ¶¶ 7 & 9.) Jackson also states that he observed water "bubbling from the test holes and the manhole cover." (*Id.* at ¶ 9.)

Jackson advised the water department personnel that utilities facilities were present and that telephone facilities existed "below the street." (*Id.* at ¶ 8.) He waited at the site until the water was turned off, and then he began placing markings that showed the location of underground utilities. (*Id.* at ¶ 10.) Jackson states that he "completed marking the telephone facilities at 0137 [1:37 a.m.] on June 2, 2009." (*Id.* at ¶ 11.)

Wemmer arrived at the site around 9:00 a.m. on June 2, 2009 and, like Jackson, "observed numerous test holes drilled in the pavement of Pearl Rd., located approximately five feet from a telephone company manhole." (*Id.*, Ex. 5 at ¶ 6.) Wemmer also noticed "markings placed by USIC in the area where the test holes were drilled." (*Id.* at ¶ 7.)

"After excavation and removal of the pavement surface in the damage area, [Wemmer] observed a concrete-encased conduit containing telephone lines." (*Id.* at ¶ 8.) He also noticed "a hole drilled in the top surface of the concrete-encased conduit of the same type and the same size as the test holes drilled in the pavement directly above the conduit in the damage area." (*Id.* at ¶ 9.) Once the concrete conduit sheathing was removed, Wemmer then "observed shattered PVC conduit pipe in the area directly under the hole bored in the concrete casting." (*Id.* at ¶ 10.) One shattered PVC conduit pipe contained damaged telephone cable, and another was empty. (*Id.* at ¶¶ 10-11.) Wemmer opines that the damage to the PVC conduit and the telephone cable "is consistent with the type of damage by a concrete drill of the type used to drill the test holes [that he] observed in the pavement and the conduit above the damage area." (*Id.*)

### ii. Ohio Bell personnel

The affidavit of Michael D. Diederich, a senior Technical Network Services Manager for Ohio Bell, supports the factual observations of USIC employees Jackson and Wemmer. (Brief Contra MSJ, Ex. 6, ¶ 1.) Diederich was at scene, acting as supervisor of Ohio Bell personnel charged with repairing the damage to its cable and conduit. (*Id.* at ¶¶ 2-4.) He "observed that the drilled holes at the pavement surface traced directly to the concrete top of the Telephone Company duct package and into the blue plastic duct and further into the back sheath of the cable." (*Id.* at ¶ 5).

{¶5} Ultimately, the trial court concluded that "[t[he City failed to demonstrate that its actions involved anything other than routine decisions in how to repair a water main leak" and that the immunity provided in R.C. 2744.03(A)(5) did not apply. The court further found that the record did not demonstrate a lack of a genuine issue of material fact as to negligence and that there was a genuine issue of material fact as to causation.

{¶6} The City filed this appeal, raising one assignment of error for our review. The City claims the trial court erred in not granting summary judgment to the City on the basis of sovereign immunity under R.C. Chapter 2744.

{¶7} Appellate review of summary judgment is de novo, governed by the standard set forth in Civ.R. 56. *Comer v. Risko*, 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712, ¶ 8. Accordingly, we afford no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate. *Hollins v. Shaffer*, 182 Ohio App.3d 282, 2009-Ohio-2136, 912 N.E.2d 637, ¶ 12 (8th Dist.). Under Civ.R. 56(C), summary judgment is proper when the moving party establishes that

> (1) no genuine issue of any material fact remains, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and construing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made.

*State ex rel. Duncan v. Mentor City Council*, 105 Ohio St.3d 372, 2005-Ohio-2163, 826 N.E.2d 832, ¶ 9, citing *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977).

{¶8} The Ohio Supreme Court has outlined a three-tier analysis for determining whether a political subdivision is entitled to immunity under R.C. Chapter 2744. The first tier is the general grant of immunity set forth in R.C. 2744.02(A)(1), which establishes that a political subdivision is immune from liability incurred in connection with either a governmental function or proprietary function. *Smith v. McBride*, 130 Ohio St.3d 51, 2011-Ohio-4674, 955 N.E.2d 954, ¶ 13. However, that immunity is not absolute. *Id.* at ¶ 14. Thus, the second tier of the analysis requires a court to consider the five exceptions to immunity listed in R.C. 2744.02(B), which can expose the political subdivision to liability. *Id.* If any of the exceptions in R.C. 2744.02(B) apply and no defense in that section negates the liability of the political subdivision under that section, then the third tier of the analysis requires a court to determine whether any of the defenses in R.C. 2744.03 apply to reinstate immunity. *Id.* at ¶ 15.

{¶9} As to the first and second tiers of the analysis, we recognize that the City's maintenance and operation of a municipal water supply system is a proprietary function, R.C. 2744.01(G)(2)(c), and that the City may be liable for the loss to property caused by

the negligent performance of acts by its employees with respect to proprietary functions. R.C. 2744.02(B)(2). It is the third tier of the analysis, and more specifically the defense afforded under R.C. 2744.03(A)(5), that is at issue in this matter.

{¶10} R.C. 2744.03(A)(5) provides as follows:

The political subdivision is immune from liability if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner.

{¶11} Ohio courts have been left to determine what constitutes "the exercise of judgment or discretion" in order to invoke this defense. There is limited authority from the Ohio Supreme Court on this issue. In *Perkins v. Norwood City Schools*, 85 Ohio St.3d 191, 193, 1999-Ohio-261, 707 N.E.2d 868, the court held that R.C. 2744.03 did not apply to a principal's decision of whom to employ to repair a leaking drinking fountain because this was a "routine maintenance decision requiring little judgment or discretion."

{¶12} In *Elston v. Howland Local Schools*, 113 Ohio St.3d 314, 2007-Ohio-2070, 865 N.E.2d 845, the court distinguished R.C. 2744.03(A)(5) from R.C. 2744.03(A)(3), which concerns an employee's discretionary actions with respect to policy-making, planning, or enforcement powers. *Id.* at ¶ 27. In this regard,

"once the decision has been made to engage in a certain activity or function, the state may be held liable, in the same manner as private parties, for the negligence of the actions of its employees and agents in the performance of such activities."

*Id.* at ¶ 28, quoting *Reynolds v. State*, 14 Ohio St.3d 68, 471 N.E.2d 776 (1984), paragraph one of the syllabus; *see also Franks v. Lopez*, 69 Ohio St.3d 345, 348-349, 632 N.E.2d 502 (1994) (recognizing same). On the other hand, R.C. 2744.03(A)(5) concerns the exercise of judgment and discretion in the acquisition or use of equipment or facilities and applies to

an individual employee's exercise of judgment or discretion in determining whether to acquire or how to use equipment or facilities unless the judgment was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner * * *.

*Elston* at ¶ 31 (finding teachers and coaches, as employees of a political subdivision, have wide discretion under R.C. 2744.03(A)(5) to determine what level of supervision is necessary to ensure the safety of the children in their care); *see also Cramer v. Auglaize Acres*, 113 Ohio St.3d 266, 2007-Ohio-1946, 865 N.E.2d 9 (suggesting nurses' decision to use a Hoyer lift to put patient in bed and treatment decisions are discretionary acts under the ambit of R.C. 2744.03(A)(5)).

{¶13} Consistent with *Perkins*, this court has previously recognized that R.C. 2744.03(A)(5) does not shield from liability "'[r]outine decisions requiring little judgment or discretion[.]'" *FirstEnergy Corp. v. Cleveland*, 182 Ohio App.3d 357, 2009-Ohio-2257, 912 N.E.2d 1156, ¶ 27 (8th Dist.), quoting *Addis v. Howell*, 137 Ohio App.3d 54, 60, 738 N.E.2d 37 (2d Dist.2000); *see also Frenz v. Springvale Golf Course*

*& Ballroom*, 8th Dist. No. 97593, 2012-Ohio-3568. Similarly, R.C. 2744.03(A)(5) does not protect "'those decisions which involve inadvertence, inattention, or unobservance.'" *FirstEnergy* at ¶ 27, quoting *Addis* at 60. Rather, we have stated that this provision requires "'some positive exercise of judgment that portrays a considered adoption of a particular course of conduct in relation to an object to be achieved[.]'" *Id.* at ¶ 28, quoting *Addis* at 60.

{¶14} Other appellate courts have observed that "immunity attaches only to the broad type of discretion involving public policy made with 'the creative exercise of political judgment.'" *McVey v. Cincinnati*, 109 Ohio App.3d 159, 163, 671 N.E.2d 1288 (1st Dist.1995), quoting *Bolding v. Dublin Local School Dist.*, 10th Dist. No. 94APE09-1307, 1995 Ohio App. LEXIS 2455 (June 15, 1995); *Mathews v. Waverly*, 4th Dist. No. 08CA787, 2010-Ohio-347, ¶ 45; *see also Inland Prods., Inc. v. Columbus*, 193 Ohio App.3d 740, 2011-Ohio-2046, 954 N.E.2d 141, ¶ 62 (10th Dist.) (finding decision to utilize a hydraulic gradeline modeling to predict the effects of closing a gate as a flood-control measure was an exercise of judgment or discretion under R.C. 2744.03(A)(5)). Indeed, a political subdivision cannot simply assert that all of its decisions are "discretionary" in order to obtain protection under R.C. 2744.03(A)(5). *Hacker v. Cincinnati*, 130 Ohio App.3d 764, 770, 721 N.E.2d 416 (1st Dist.1998).

{¶15} As stated in *McVey*, "[i]mmunity does not apply to the negligence of employees in 'the details of carrying out the activity even though there is discretion in making choices.'" *Id.* at 163, quoting *Bolding*. Thus, "[o]nce a decision is made, * * *

the government entity still can be liable for the negligent implementation of its decision."

*Seiler v. Norwalk*, 192 Ohio App.3d 331, 2011-Ohio-548, 949 N.E.2d 63, ¶115 (6th Dist.), citing *Enghauser Mfg. Co. v. Eriksson Eng. Ltd.*, 6 Ohio St.3d 31, 32, 451 N.E.2d 228 (1983); *see also Howell v. The Union Twp. Trustees*, 4th Dist. No. 96CA2430, 1997 Ohio App. LEXIS 1260 (Mar. 18, 1997) (finding the decision concerning the method to control road dust was discretionary, but the implementation of that decision was not protected by sovereign immunity).

{¶16} In this case, the City's response to the water main break involved the positive exercise of judgment and discretion in the use of its equipment and resources. Campbell's affidavit reflects that when he responded to the location of the water main break, he observed the conditions and determined it was "an emergency in need of immediate attention." He then determined the method and equipment to be utilized for locating the source of the break. He proceeded to use a rotary tool to drill into the pavement and inserted test rods to the depth of about nine feet in an effort to find the location of the break. Campbell was later relieved by Barkley, who continued to drill test holes. These determinations were more than routine maintenance decisions requiring little judgment or discretion. However, the record reflects genuine issues of material fact as to whether this discretion was exercised in a wanton or reckless manner.

{¶17} "Recklessness" requires more than mere negligence. *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, ¶ 74. It has been defined as "a perverse disregard of a known risk" and requires that the actor be conscious that his

conduct will in all probability result in injury. *Id.* at ¶ 73-74. "Wanton misconduct" is the failure to exercise any care whatsoever under conditions in which there is great probability that harm will result. *Hawkins v. Ivy*, 50 Ohio St.2d 114, 363 N.E.2d 367 (1977), syllabus.

{¶18} The City argues that Ohio Bell failed to allege wanton or reckless behavior in its original complaint, and that its later amendment of the complaint to interject this claim was not supported by the facts. As supplemental authority, the City cites *Ohio Bell Tel. Co. v. DiGioia-Suburban Excavating, LLC*, 8th Dist. Nos. 89708 and 89907, 2008-Ohio-1409, a case that involved a water main break and an ensuing gas explosion, wherein a city employee delayed shutting down a 24-inch water main until a 12-inch water main was ruled out as the source. The court found that the city was entitled to summary judgment based on political subdivision immunity when the plaintiffs alleged only negligence and not that the city had acted with malicious purpose, in bad faith, or in a wanton or reckless manner. *Id.* Unlike the *DiGioia-Suburban Excavating* case, in this case Ohio Bell's second amended complaint included specific allegations of wanton and reckless conduct. Furthermore, as this court noted in *FirstEnergy*, several of this court's prior decisions, including *DiGioia-Suburban Excavating*, did not specifically address the "exercise of judgment or discretion" aspect of R.C. 2744.03(A)(5) and had only impliedly found that this requirement was met. *FirstEnergy,* 182 Ohio App.3d 357, 2009-Ohio-2257, at ¶ 25, fn.1, citing *DiGioia-Suburban Excavating, LLC*; and *FirstEnergy Corp. v. Cleveland*, 179 Ohio App.3d 280, 2008-Ohio-5468, 901 N.E.2d 822

(8th Dist.); *see also Williams v. Brewer*, 8th Dist. No. 93829, 2010-Ohio-5349 (no expansive analysis of this term).

{¶19} Here, Ohio Bell claims the City's workers were reckless by not waiting until OUPS markings were in place, by drilling test holes without knowing what underground utilities were present, by drilling within five feet of visible indications of underground utilities, and by drilling far beyond what one would reasonably expect the depth of the street pavement to be. There was evidence that the excavation was performed near underground utility facilities that were visibly marked. There was also evidence that the excavation began before OUPS arrived to mark the location of underground utility facilities. Upon the record before us, we find there are genuine issues of material fact as to whether the City's workers acted in a wanton or reckless manner in proceeding with the excavation.

{¶20} Furthermore, as previously discussed, R.C. 2744.03(A)(5) does not protect the City from liability for any damage that proximately resulted to Ohio Bell's property from the alleged negligence of its employees in carrying out the excavation. Ohio Bell alleges that the City caused damage to its property and underground utility facilities by failing to maintain reasonable clearance while drilling and by failing to protect the visible markings of the underground utility facilities and otherwise failing to excavate in a careful and prudent manner. Ohio Bell submitted evidence establishing that test holes were drilled in the area above the damaged PVC conduit. Several individuals observed damage consistent with the drill holes and the type of damage that could be caused by the

type of drill that was used. Upon our review, we find the record presents genuine issues of material fact pertaining to whether the City's conduct was negligent and whether it was the cause of the damage to Ohio Bell's property.

**{¶21}** Accordingly, we conclude the City is not entitled to summary judgment on the basis of sovereign immunity. The City's sole assignment of error is overruled.

**{¶22}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

SEAN C. GALLAGHER, PRESIDING JUDGE

KENNETH A. ROCCO, J., and
KATHLEEN ANN KEOUGH, J., CONCUR