[Cite as *Boucher v. Cleveland*, 2023-Ohio-1818.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

MAUREEN BOUCHER,                          :

    Plaintiff-Appellee,               :

                                 No. 112079

    v.                                :

CITY OF CLEVELAND,                        :

    Defendant-Appellant.              :

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 1, 2023

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-21-953310

### *Appearances:*

The Henry Law Firm and Eric W. Henry, *for appellee.*

Mark Griffin, Cleveland Director of Law, and Jerome A.
Payne, Jr., Assistant Director of Law, *for appellant.*

EILEEN T. GALLAGHER, J.:

{¶ 1} Defendant-appellant, the city of Cleveland (the "city"), appeals from the trial court's judgment denying its motion for summary judgment. The city raises the following assignments of error for review:

> 1. It was reversible error for the trial court to hold that there was a genuine issue of material fact as to when the city's employee installed

cones and tape at a certain location when the uncontradicted documentary evidence in the record reflected that the work at issue was completed on October 12, 2019.

2. It was reversible error for the trial court to hold that the city's employee's failure to recall "whether he performed the work on the subject area on Saturday, October 12 or Sunday October 13" created a genuine issue of material fact when there also existed unambiguous and uncontradicted documentary evidence and testimony in the record establishing that the work at issue was completed on October 12, 2019.

3. It was reversible error for the trial court to hold that a time stamp at the bottom of "Defendant's Daily Log" documented that the area at issue was secured by cones and caution tape "at 1:44 p.m. on October 13, 2019," with no evidentiary support especially when there was a second, identical Daily Log in the record but with a different time stamp of 12/09/2020 at 10:22 a.m., and the copies of the Daily Log also each included a description of the work at issue in the box labeled "done" and clearly dated 10/12/2019.

4. As a matter of law, under R.C. 2744.03, the city is immune from liability for injuries allegedly caused from the exercise of judgment or discretion in using personnel, equipment, and resources.

{¶ 2} After careful review of the record and relevant case law, we affirm the trial court's judgment.

## I. Procedural and Factual History

{¶ 3} This matter stems from a personal injury lawsuit filed against the city by plaintiff-appellee, Maureen Boucher ("Boucher").

{¶ 4} Shortly before 12:00 p.m. on Sunday, October 13, 2019, Boucher and her friend, Barbra McCoy ("McCoy"), were walking westbound on a sidewalk located on West 3rd Street in Cleveland, Ohio. At some point, Boucher stepped onto a utility-access port located on the sidewalk. The concrete block covering the access port was damaged, causing Boucher's foot to fall through the covering and into the

recessed access port. As a result of the incident, Boucher sustained injuries to her leg and foot.

{¶ 5} According to Boucher and McCoy, "there was no caution tape, cones, or any other markings or warnings indicating that the utility box cover was unsafe or posed a hazard." (McCoy affidavit a ¶ 6; Boucher depo. tr. at 33.) McCoy took multiple photographs of the broken utility-port cover shortly after Boucher was taken away in an ambulance. Collectively, the photographs depict the scene as it existed at the time of Boucher's fall and, subsequently, as it existed once the police secured the utility-access port by "placing cones and caution tape around it." (McCoy affidavit at ¶ 8.) Danny Chalhoub ("Chalhoub"), an employee of a nearby restaurant who assisted Boucher from the ground, similarly expressed that "at the time [Boucher] fell, there was no caution tape, barricades, cones, or any other sign warning of any hazardous condition or danger associated with the cement slab or the utility hold." (Chalhoub affidavit at ¶ 7.)

{¶ 6} On September 21, 2021, Boucher filed a civil complaint against the city, alleging that she sustained "serious injuries and damages" as a direct and proximate result of the city's "failure to inspect, maintain, warn of, and/or repair the hazardous condition presented by the broken concrete block prior to October 13, 2019."

{¶ 7} On June 15, 2022, the city filed a motion for summary judgment, arguing that it "is entitled to political subdivision immunity and the record is devoid of evidence to establish that any of the exceptions to immunity apply." Alternatively, the city argued that even if one of the exceptions apply, "immunity is restored

because defendant made discretionary decisions regarding allocation of resources and personnel."

{¶ 8} In support of its motion for summary judgment, the city attached (1) the affidavit and deposition testimony of Assistant Commissioner of Cleveland Public Power, Bernie Jackson ("Jackson"), (2) the deposition testimony of Joseph Wilson ("Wilson"), a Trouble Department foreman, (3) the deposition testimony of Boucher, (4) the deposition testimony of McCoy, (5) photographs of the damaged utility port, and (6) a copy of Cleveland Public Power's Dispatcher Daily Log, dated October 12, 2019.

{¶ 9} Relevant to this appeal, Cleveland Public Power is a 300-person division of the city of Cleveland. As part of its operations, Cleveland Public Power employs a Trouble Department that is tasked with responding to emergency calls 24 hours a day.

{¶ 10} The evidence supporting the city's motion for summary judgment demonstrates that on Saturday, October 12, 2019, the Trouble Department received a complaint, notifying it of the broken utility-port cover located on the sidewalk of West 3rd Street. The call was received by Trouble Department dispatcher, Charles Pankratz ("Pankratz"), at approximately 12:05 p.m. In accordance with his job responsibilities, Pankratz notified foreman Wilson of the complaint and instructed Wilson to investigate the damaged property and secure the area. Pankratz also documented the reported issue in a Daily Log report. The Daily Log indicates that Wilson's crew "start[ed]" its work at approximately 12:06 p.m. and "stop[ped]" its

work at approximately 12:45 p.m. The "Work Done" section of the log states that Wilson's crew took the following actions: "coned off broken pole-box cover in side walk [-] refer to replace ASAP." The timestamp located on the subject daily log is dated Sunday, October 13, 2019, at 1:44:28 p.m.

{¶ 11} With respect to the timestamp, Pankratz confirmed that the Trouble Department's data-entry system creates a timestamp once the dispatcher completes the "work-done" section of the report and "closes out" the Daily Log. (Pankratz depo. at tr. 28-29.) Nevertheless, when questioned about the timestamp located at the bottom of the Daily Log report, Pankratz testified that he did not have a complete understanding of "that particular aspect of the daily log." (*Id*. at 30-31.) Pankratz suggested, while acknowledging his uncertainty, that the timestamp may have reflected when the document was printed by a member of the Trouble Department.

{¶ 12} Wilson testified that upon receiving the dispatch from Pankratz, he arrived at West 3rd Street and identified the reported issue. Wilson stated that the utility-port cover was sunken and not level with the sidewalk because the concrete surrounding the cover was "severely uneven." (Wilson depo. tr. at 25.) According to Wilson, his crew did not attempt to permanently fix the damaged utility-port cover because it required the services of an underground construction crew. Wilson testified that he attempted to make the area safe "so nobody would get injured," stating,

> So I coned it off, some caution tape. I grabbed a couple of barrels that were in the area to make it more visible and more so that people couldn't walk through it and that's what I did for it. And then

immediately I make my call to dispatch to get it into the hands of the right people that can fix it permanently.

(Wilson depo. tr. 26-27.)

{¶ 13} Pertinently, Wilson estimated that he and his crew were at the scene for approximately 20 minutes. He testified that he could not recall whether he received the dispatch on a Saturday or a Sunday. (*Id.* at 21.) However, Wilson maintained that "if the dispatch came in on October 12," he responded to the scene of the damaged property "on that same day." (*Id.* at 26.) In making this statement, Wilson conceded that he was relying exclusively on the date set forth in the Daily Log report and did not have an independent memory of the date or day of week he secured the utility-port cover.

{¶ 14} Assistant Commissioner Jackson provided extensive testimony at his deposition concerning the role of the Trouble Department and the nature of the work performed by its staff members. Jackson testified that there is no formal policy in place regarding the time in which the Trouble Department is required to respond to an emergency. However, he expressed that emergencies are routinely addressed by the Trouble Department on the same day they are reported, stating "once we're notified of [an emergency], we make sure someone goes out and addresses it." (Jackson depo. at tr. 22.)

{¶ 15} Jackson further described the role of the dispatchers and the Daily Log report. Jackson explained that once a call comes into the Trouble Department, a dispatcher creates a log and contacts a crew to respond to the scene of the reported

issue. Once the crew assesses the issue, it reports back to the dispatcher about the actions they took and whether the issue needs to be referred to another department. If the issue requires a referral to another department, the dispatcher is tasked with contacting the supervisor of the appropriate department via email to notify him or her of the work to be completed. Jackson testified that once the Trouble Department finishes the required work or otherwise refers the matter to another department, the Daily Log report generated by the dispatcher is closed out. (Jackson depo. at tr. 29.)

{¶ 16} Regarding the Daily Log report completed by Pankratz in this case, Jackson expressed that it was his understanding that the log had to have been completed on October 12, 2019, because the date is automatically generated by the programming once the log is opened by the dispatcher. With that stated, however, Jackson conceded that he did not have any firsthand knowledge of whether Wilson placed cones around the damaged property on October 12, 2019, or whether the cones were present at the time Boucher fell on October 13, 2019.

{¶ 17} Finally, Jackson averred that as a foreman, Wilson had "the discretion in deciding when and how safety measures are implemented when responding to department calls." Jackson explained as follows:

> Trouble Department Foreman are expected to access the situation and based on their experience and training make the appropriate decision in securing the area. Placing caution tape and warning cones around a pole box until it can be repaired is consistent with our employee training. Pole box covers are considered a heavy item that the Trouble Department does not repair or replace. Trouble Department employees do not carry replacement pole box covers in their vehicles. Pole box covers are repaired/replaced by an underground construction crew. Pole box repair/replacement calls that occur on the weekend are

usually scheduled for repair/ replacement on the upcoming weekday. Trouble Department foreman have the discretion to request an immediate response from an underground construction crew for issues he/she deems to be an emergency situation that requires an immediate response. * * * Due to budgetary constraints and personnel shortfalls, CPP's underground construction crews operate during the weekdays and are used on the weekends on an emergency basis.

(Jackson affidavit at ¶ 2-3.)

{¶ 18} Based on the foregoing evidence, the city maintained that although it had notice of the hazardous condition on October 12, 2019, it was not negligent in its performance of a proprietary function where the uncontroverted facts demonstrate that "Wilson took the necessary steps to protect and warn others to avoid the [utility-port] area by putting up cones and caution tape." Alternatively, the city asserted that it was entitled to immunity pursuant to R.C. 2744.03(A)(5) because the injury complained of resulted from Wilson's exercise of judgment or discretion in relation to how he "investigated, secured, and scheduled the utility port repair" on October 12, 2019.

{¶ 19} On July 15, 2022, Boucher filed a brief in opposition to the city's motion for summary judgment, arguing the city "is not entitled to sovereign immunity where [she] has shown significant evidence that she was injured due to the negligence of a city employee engaged in a proprietary function." Regarding the application of the exception to immunity contained at R.C. 2744.02(B)(2), Boucher maintained that "the evidence in this case creates, at a minimum, a factual issue as to whether Joseph Wilson was negligent in failing to secure the [known hazard] in a timely manner as was necessary for this emergency." According to Boucher, "the

evidence shows Wilson did not secure the broken handhole cover on October 12, 2019." Rather, Boucher maintained that the work was completed on October 13, 2019, stating:

> Importantly, Wilson was unsure of the date or time that he actually observed the scene. Wilson could not remember whether he got the call on a Saturday (October 12th) or Sunday (October 13th). Wilson does not recall what time he responded to the call. Wilson admitted that he did not know the exact date he claims to have put cones or tape up around the [utility port]. He stated it was possible he put cones and tape up after the Browns game on October 13th. Other witnesses testified plainly that the area had not been secured prior to Maureen Boucher's fall before the Browns game on October 13th, 2019.
>
> * * *
>
> [Additionally], the Daily Log itself shows a completion timestamp of October 13, 2019 at 1:44 p.m. — after [Boucher] had already fallen. The timestamp is automatically generated in the computer management system after the solution to the problem is documented and cannot be manually changed by employees.

{¶ 20} Boucher further argued that the city cannot establish any of the defenses listed under R.C. 2744.03 because Wilson's discretionary exercise of judgment is not relevant where the evidence suggests that he "failed to act on the emergency complaint reported on October 12th despite knowing that on October 13th that the same sidewalk would be crowded with pedestrians." Boucher explained that her negligence claim "is not based on how the city chose to make the hazard safe, but rather on the city's failure to do anything to make the hazard safe before she fell."

{¶ 21} In support of her brief in opposition, Boucher attached (1) a copy of Cleveland Public Power's Dispatcher Daily Log, dated October 12, 2019, (2) the

affidavit of Chalhoub, (3) the affidavit of McCoy, (4) photographs of the damaged handhole cover, and (5) the deposition testimony of Boucher, Pankratz, Wilson, and Jackson.

{¶ 22} On September 28, 2022, the trial court denied the city's motion for summary judgment, stating, in relevant part:

> In its motion for summary judgment, the defendant concedes that it was on notice of a dangerous condition. Nevertheless, the defendant argues that it was not negligent as its agent, Joseph Wilson, reasonably secured the area with cones and caution tape. Defendant claims that this was sufficient and appropriate until a more permanent repair could be effectuated. Defendant alternatively asserts that even if Mr. Wilson's actions somehow fell below the standard of care (i.e. simply securing the area vs. implementing a permanent repair) immunity is reinstated as Mr. Wilson was exercising judgment and discretion in the use of the defendant's resources.
>
> The problem with defendant's arguments, both as to compliance with the standard of care and exercise of judgment, is they assume that the defendant actually did what it claims, and installed cones and caution tape prior to the plaintiff's injury. Defendant's motion for summary judgment must be denied in this case as the evidence before the court creates an issue of material fact as to when Mr. Wilson actually installed the cones and caution tape.
>
> Numerous witnesses, in addition to the plaintiff, have testified that at the time of the plaintiff's injury there was no caution tape, barricades, cones, or any other sign or warning of a hazardous condition. It is certainly possible that someone removed the caution materials after Mr. Wilson's placement at the scene. And while there is no evidence to support this supposition, this would potentially explain their absence at the time of plaintiff's accident. However, according to Mr. Wilson's own deposition he is unable to recall whether he performed the work on the subject area on Saturday, October 12th or Sunday, October 13th. He also cannot attest as to the time he completed his actions, before or after the plaintiff was injured. Finally, the defendant's daily log documents the work as being completed by Mr. Wilson at 1:44 October 13, 2019, after plaintiff's injury occurred. For these reasons, defendant's motion for summary judgment based upon the application of sovereign immunity must be denied.

{¶ 23} The city now appeals from the trial court's judgment.

## II. Law and Analysis

{¶ 24} Within its first, second, third, and fourth assignments of error, the city argues that the trial court committed reversible error by denying its motion for summary judgment. The city contends that the "unambiguous and uncontradicted documentary evidence and testimony" demonstrates that city employees timely responded to the reported hazard on October 12, 2019, and exercised reasonable care in securing the area. Alternatively, the city contends that even if Boucher could prove the necessary elements for a claim of negligence, the city is immune from liability by operation of R.C. 2744.03(A)(5). We address the city's assignments of error together because they are related.

## A. Standard of Review

{¶ 25} An appellate court reviews the grant or denial of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). In a de novo review, this court affords no deference to the trial court's decision and we independently review the record to determine whether the denial of summary judgment is appropriate. *Hollins v. Shaffer*, 182 Ohio App.3d 282, 2009-Ohio-2136, 912 N.E.2d 637, ¶ 12 (8th Dist.).

{¶ 26} Summary judgment is appropriate if (1) no genuine issue of any material fact remains; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and construing the evidence most strongly in favor of the nonmoving

party, that conclusion is adverse to the party against whom the motion for summary judgment is made. *Grafton* at 105, citing *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 631 N.E.2d 150 (1994).

{¶ 27} The party moving for summary judgment bears the burden of demonstrating that no material issues of fact exist for trial. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). The moving party has the initial responsibility of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claims. *Id.* After the moving party has satisfied this initial burden, the nonmoving party has a reciprocal duty to set forth specific facts by the means listed in Civ.R. 56(C) showing that there is a genuine issue of material fact. *Id.*

## B. Jurisdiction

{¶ 28} Typically, an order denying a motion for summary judgment is not a final, appealable order. *Ceasor v. E. Cleveland*, 2018-Ohio-2741, 112 N.E.3d 496, ¶ 13 (8th Dist.), citing *Hubbell v. Xenia*, 115 Ohio St.3d 77, 2007-Ohio-4839, 873 N.E.2d 878, ¶ 9, citing *State ex rel. Overmeyer v. Walinski*, 8 Ohio St.2d 23, 24, 222 N.E.2d 312 (1966). However, R.C. 2744.02(C) provides:

> An order that denies a political subdivision or an employee of a political subdivision the benefit of an alleged immunity from liability as provided in this chapter or any other provision of the law is a final order.

{¶ 29} While we are authorized to review the trial court's decision, the scope of that review is limited. *Id.* at ¶ 14. We may only examine "alleged errors in the

portion of the trial court's decision that denied the benefit of immunity." *Id.*, citing *Reinhold v. Univ. Hts.*, 8th Dist. Cuyahoga No. 100270, 2014-Ohio-1837, ¶ 21, citing *Riscatti v. Prime Properties Ltd. Partnership*, 137 Ohio St.3d 123, 2013-Ohio-4530, 998 N.E.2d 437, ¶ 20.

### C. Political Subdivision Immunity

{¶ 30} A determination of whether a political subdivision has immunity involves a three-step analysis. *Smith v. McBride*, 130 Ohio St.3d 51, 2011-Ohio-4674, 955 N.E.2d 954, ¶ 13, citing *Colbert v. Cleveland*, 99 Ohio St.3d 215, 2003-Ohio-3319, 790 N.E.2d 781; *Lambert v. Clancy*, 125 Ohio St.3d 231, 2010-Ohio-1483, 927 N.E.2d 585.

{¶ 31} R.C. 2744.02(A)(1) divides the functions of a political subdivision into two types, governmental functions and proprietary functions. Under the first tier, if a defendant is determined to be a political subdivision, it is immune from liability for its governmental and proprietary functions "in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision * * *." R.C. 2744.02(A)(1).

{¶ 32} Political-subdivision immunity, however, is not absolute. As a result, the second step of the analysis focuses on the five exceptions to immunity listed in R.C. 2744.02(B), which can expose the political subdivision to liability. *Colbert* at ¶ 8, citing *Cater v. Cleveland*, 83 Ohio St.3d 24, 24, 697 N.E.2d 610 (1998). Relevant to this appeal, R.C. 2744.02(B)(2) provides as follows:

> Except as otherwise provided in sections 3314.07 and 3746.24 of the
> Revised Code, political subdivisions are liable for injury, death, or loss

to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions.

{¶ 33} If any of the exceptions in R.C. 2744.02(B) apply, and if no defense in that section protects the political subdivision from liability, then the third step of the analysis requires an assessment of whether any defenses in R.C. 2744.03 apply to reinstate immunity. *Id.* at ¶ 9. If none of the R.C. 2744.02(B) exceptions to immunity apply, however, R.C. 2744.03's defenses need no consideration.

{¶ 34} As relevant here, R.C. 2744.03 provides, in pertinent part:

In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish nonliability:

* * *

(5) The political subdivision is immune from liability if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner.

R.C. 2744.03(A)(5).

## 1. General Immunity — R.C. 2744.02(A)(1)

{¶ 35} In this case, there is no dispute that the city is a political subdivision. Thus, the pertinent issues before this court are whether there remain triable issues of material fact concerning (1) whether the city, through the act of its employee, negligently performed an act related to a proprietary function, and, if so, (2) whether Boucher's injury "resulted from the exercise of judgment or discretion in

determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources[.]" *See* R.C. 2744.02(B)(2) and 2744.03(A)(5).

## 2. Exception to Immunity — R.C. 2744.02(B)(2)

{¶ 36} In the second tier of the immunity analysis, we determine whether one of the five exceptions to immunity outlined in R.C. 2744.02(B) applies to hold the political subdivision liable for damages. As previously mentioned, the exception to immunity contained in R.C. 2744.02(B)(2) provides that "a political subdivision is liable in damages in a civil action for injury, death, or loss to persons or property caused by an act or omission of the political subdivision or any of its employees in connection with the performance of a proprietary function." *Hill v. Urbana*, 79 Ohio St.3d 130, 679 N.E.2d 1109 (1997), paragraph one of the syllabus. A proprietary function is defined, in relevant part, as a function that "promotes or preserves the public peace, health, safety, or welfare and that involves activities that are customarily engaged in by nongovernmental persons." R.C. 2744.01(G)(1)(b). A proprietary function includes "[t]he establishment, maintenance, and operation of a utility, including, but not limited to, a light, gas, power, or heat plant, a railroad, a busline or other transit company, an airport, and a municipal corporation water supply system." R.C. 2744.01(G)(2)(c).

{¶ 37} Before R.C. 2744.02(B)(2) will remove a political subdivision's immunity, a plaintiff must establish the elements required to sustain a negligence action. *Puffenberger v. Cleveland*, 8th Dist. Cuyahoga No. 99660, 2013-Ohio-4479,

¶ 8.  A plaintiff alleging negligence must demonstrate the existence of a duty, a breach of that duty, proximate cause, and damages.  *See, e.g., Menifee v. Ohio Welding Prods., Inc.*, 15 Ohio St.3d 75, 77, 472 N.E.2d 707 (1984).  If negligence is not proven, the city is not liable.

{¶ 38} Liability for damages against the city cannot arise as a matter of law except on proof that the city created a faulty or defective condition, or it had actual or constructive notice of the hazardous condition.  *Cleveland v. Amato*, 123 Ohio St. 575, 176 N.E. 227 (1931); *Wilke v. Brook Park*, 8th Dist. Cuyahoga No. 74636, 1999 Ohio App. LEXIS 6055 (Dec. 16, 1999).  "'[W]here negligence revolves around the question of the existence of a hazard or defect, the legal princi[ple] prevails that notice, either actual or constructive, of such hazard or defect is a prerequisite to the duty of reasonable care.'"  *Vasquez-Cromer v. Toledo*, 6th Dist. Lucas No. L-18-1266, 2019-Ohio-5149, ¶ 17, quoting *Heckert v. Patrick*, 15 Ohio St.3d 402, 405, 473 N.E.2d 1204 (1984).

{¶ 39} In this case, there is no dispute that Boucher's negligence claim directly relates to the city's performance of a proprietary function.  It is also undisputed that the city received actual notice of the hazardous utility-port cover on October 12, 2019.  Nevertheless, the city argues that the evidence supporting its motion for summary judgment demonstrates that its agent, Wilson, responded to the reported hazard in a timely fashion and "secured the area for repair in a reasonable manner consistent with his training."  The city contends that in the absence of any evidence to suggest that "Wilson's methods and decisions fell below

an established standard of care, there is no evidence of negligent performance by a city employee with respect to a proprietary function."

{¶ 40} In contrast, Boucher reiterates her position that there remain genuine issues of fact regarding whether Wilson secured the reported hazard on October 12, 2019, as the city suggests. According to Boucher, "the evidence in this case strongly supports the conclusion that the city did not secure the hazardous broken [utility-port cover] until after [she] fell on October 13, 2019." Boucher notes that (1) "three witnesses testified that the area had not been secured on October 13, 2019, when [she] fell," (2) Wilson testified that he may have secured the area on a Sunday, and (3) the timestamp located on the city's Daily Log suggests that the work was not performed until after she fell on Sunday, October 13, 2019.

{¶ 41} Construing the available evidence in favor of Boucher, we agree with the trial court's determination that there remain genuine issues of material fact regarding whether the city secured the utility-port cover before or after Boucher's fall. In this case, city employees Wilson, Pankratz, and Jackson each estimated that members of the Trouble Department responded to West 3rd Street on October 12, 2019, to secure the damaged utility-port cover. However, in each instance, Wilson, Pankratz, and Jackson did not have an independent memory of the date the hazardous condition was reported and could not recall the specific day of the week the work was performed. Rather, each employee assumed that the work was completed on October 12, 2019, based on the date reflected at the top of the Daily Log report. Because the employees' recollection of the completed work depends

exclusively on their interpretation of the information contained in the documentary evidence, a careful examination of the Daily Log report is necessary.

{¶ 42} As previously discussed, the subject Daily Log conclusively sets forth the date the hazardous condition was reported to the Trouble Department, i.e., October 12, 2019. However, on its face, the log's reference to the date, October 12, 2019, does not unambiguously confirm that the work was completed that same day. In this regard, Jackson testified that the date reflected in the log is automatically generated once the dispatcher receives notice of the reported condition and creates a Daily Log sheet. (Jackson depo. tr. at 43.) The "work done" section of the log is left blank and is only completed once the dispatcher is notified by other members of the Trouble Department that the condition has been repaired or requires a referral to another department. Significantly, Pankratz testified that the log is not closed out until the work done section is completed and the matter is resolved. (Pankratz depo. at tr. 28.) Pankratz further explained that the system puts a timestamp on the Daily Log once the work is completed and the complaint is closed out by the dispatcher. (*Id.* at tr. 28-29.)

{¶ 43} As set forth in the evidence attached to Boucher's brief in opposition to summary judgment, the time stamp located on the bottom left portion of the Daily Log states "10/13/2019 — 1:44:28 p.m." Considering the time and date of Boucher's fall, i.e., just before noon on October 13, 2019, a reasonable person may conclude that the Daily Log report relating to the hazardous utility-port cover was not closed out until 1:44 p.m. on October 13, 2019. It follows that the same reasonable person

may also conclude that the log was not closed out until October 13, 2019, because the area was not secured until after Boucher's fall.

{¶ 44} We reiterate that summary judgment is not appropriate where the facts, which must be viewed in a light most favorable to the party opposing the motion, are subject to reasonable dispute. F*riebel v. Visiting Nurse Assn. of Mid-Ohio*, 142 Ohio St.3d 425, 2014-Ohio-4531, 32 N.E.3d 413, ¶ 33. Under the foregoing circumstances, we reject the city's contention that the evidence unequivocally establishes that the Trouble Division exercised reasonable care by "plac[ing] cones and tape over the utility port on October 12, 2019." Contrary to the city's assertion on appeal, the trial court's decision is not "patently absurd," but is premised on the ambiguity contained in the documentary evidence and testimony. Accordingly, we find Boucher has produced evidence of specific facts that establish the existence of an issue of material fact concerning whether the city failed to exercise reasonable care after receiving notice of a hazardous condition relating to its maintenance or operation of a proprietary function.

### 3. R.C. 2744.03 Defenses

{¶ 45} Alternatively, the city asserts that "assuming arguendo that Boucher could prove negligence," immunity is restored "where the property damage at issue is alleged to have resulted from a city employee's negligent exercise of judgment and discretion in determining how to use equipment, supplies, materials, personnel, facilities, and other resources in responding to an incident."

{¶ 46} Under R.C. 2744.03(A)(5), political subdivisions are not liable for injuries resulting from the exercise of judgment or discretion in determining how to use personnel and resources. *Franks v. Lopez*, 69 Ohio St.3d 345, 347-348, 632 N.E.2d 504 (1994). This court has recognized that routine decisions requiring little judgment or discretion are not covered by R.C. 2744.03(A)(5). *Ohio Quay 55 L.L.C. v. Cleveland*, 2018-Ohio-752, 107 N.E.3d 194, ¶ 27 (8th Dist.), citing *Ohio Bell Tel. Co. v. Cleveland*, 8th Dist. Cuyahoga No. 98683, 2013-Ohio-270, ¶ 13. Likewise, R.C. 2744.03(A)(5) does not protect decisions that involve inadvertence, inattention, or unobservance. *Id.* Rather, "some positive exercise of judgment that portrays a considered adoption of a particular course of conduct in relation to an object to be achieved" is required to demonstrate an exercise of discretion for which R.C. 2744.03(A)(5) confers immunity. *Id.*

{¶ 47} The provision

> operates to protect political subdivisions from liability based upon discretionary judgments concerning the allocation of scarce resources; it is not intended to protect conduct which requires very little discretion or independent judgment. The law of immunity is designed to foster freedom and discretion in the development of public policy while still ensuring that implementation of political subdivision responsibilities is conducted in a reasonable manner.

*Hall v. Ft. Frye Local School Dist. Bd. of Edn.*, 111 Ohio App.3d 690, 699, 676 N.E.2d 1241 (4th Dist.1996), citing *Marcum v. Adkins*, 4th Dist. Gallia No. 93CA17, 1994 Ohio App. LEXIS 1456 (Mar. 28, 1994).

{¶ 48} On appeal, the city asserts that the Trouble Department's decision to postpone repairs until the work could be completed by the appropriate construction

crew constituted a discretionary allocation of the city's limited resources. According to the city,

> [t]he city of Cleveland Public Power Department's policies and practices demonstrated a positive exercise of judgment by management personnel, which portrayed a considered adoption of a particular repair course of conduct in relation to an object to be achieved.

{¶ 49} Based on the evidence set forth in this record, we find the remaining genuine issues of material fact render the city's reliance on R.C. 2744.03(A)(5) to be unpersuasive. As stated by the trial court, the city's arguments under R.C. 2744.03(A)(5) rely on the presumption that members of the Trouble Department did, in fact, render a discretionary judgment at the scene of the hazardous condition on October 12, 2019. Consistent with our prior discussion, we find there exist genuine triable issues that must be resolved before it can be determined whether R.C. 2744.03(A)(5) is applicable in this instance.

### III. Conclusion

{¶ 50} Viewing the facts in the case in the light most favorable to the nonmoving party and resolving any doubt in favor of the nonmoving party, we cannot say that the trial court erred in concluding that the city was not entitled to immunity from liability at the summary judgment phase of the proceedings. The city's first, second, third, and fourth assignments of error are overruled.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

KATHLEEN ANN KEOUGH, P.J., and
SEAN C. GALLAGHER, J., CONCUR